**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**18-332**

**STATE IN THE INTEREST OF**

**R.J., R.T., AND R.A.T.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 16-TP-00053
HONORABLE JOHN C. DAVIDSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, John E. Conery, and Van H. Kyzar, Judges.

**AFFIRMED.**

**Dmitrc I. Burnes**
**Burnes, Talley & Talley**
**711 Washington Street**
**Alexandria, LA 71301**
**(318) 442-4300**
**COUNSEL FOR APPELLANT:**
     **R.D.T. (mother)**

**Guy R. Lain**
**1721 Carter Street**
**Vidalia, LA 71373**
**(318) 336-8611**
**COUNSEL FOR APPELLEE:**
     **Louisiana Department of Children and Family Services**

**Zebulon M. Winstead**
**Crowell and Owens, LLC**
**3416 North Boulevard**
**Alexandria, LA 71301**
**(318) 445-1488**
**COUNSEL FOR APPELLEES:**
     **R.J. (minor child)**
     **R.T. (minor child)**
     **R.A.T. (minor child)**

**KYZAR, Judge.**

R.D.T.[1] appeals from a trial court judgment terminating her parental rights based upon a finding that she failed to substantially comply with her case plan, that there was no reasonable possibility of her complying with her case plan in the near future, and that it was in the best interest of her children that her parental rights be terminated. For the following reasons, we affirm.

## DISCUSSION OF THE RECORD

R.D.T. is the biological mother of three minor children: R.J. (birthdate January 21, 2005); R.T. (birthdate August 13, 2010); and R.A.T. (birthdate June 30, 2012). The father of R.J. was acknowledged to be W.C.J., Jr., who the state alleged was currently incarcerated with a release date of April 26, 2075. The fathers of R.T. and R.A.T. are alleged to be S.E. and T.M., respectively. This appeal only concerns the state's case against R.D.T.

Pursuant to the record, the minor children were taken into custody by the State of Louisiana through the Department of Children and Family Services (DCFS) by an oral instanter order on February 2, 2014, based on a report that R.D.T. was being arrested on extradition charges from Texas and the children were being left without a caretaker. Previously, R.D.T. was involved with the DCFS back to 2006, in regards to four older children. This is the third time that R.J. has been taken into the state's custody based on an instantar order. The oral instantar order was confirmed by the trial court on February 3, 2014, after which a continued custody hearing was held on February 4, 2014, with the result that the children were continued in the custody of the state.

---

[1] The initials of the children and their parents are used to protect the identity of the minor child. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

On February 19, 2014, the state filed a petition seeking to have the children declared children in need of care based on the following grounds: 1) the state validated claims of dependency and minor head/facial injuries against R.D.T.; 2) R.D.T. being arrested and the children had no available caretaker; upon examination by a doctor, all three children were diagnosed with facial abrasions and bruises; the two oldest children disclosed that R.D.T. hit them and their younger brother; 3) R.J.'s father was incarcerated; R.T.'s alleged father was incarcerated; and the identity of R.A.T.'s father was unknown; 4) diminished caretaker capacities exhibited by R.D.T. The state further requested that the parents be ordered to pay child support to the state while the children were in its custody. Following a March 13, 2014 answer hearing, the trial court adjudicated the children on April 10, 2014, as children in need of care. As part of its judgment, the trial court ordered the children to remain in the custody of the state and it approved DCFS' case plan goal of reunification for the children.

Following the development of case plans for R.D.T. and the children, case review hearings were held in this matter on August 4, 2014, January 5, 2015, July 6, 2015, January 4, 2016, June 13, 2016, and July 17, 2017. Permanency hearings were held on January 5, 2015, January 4, 2016, January 9, 2017, and January 8, 2018. Initially, the state recommended that the children be reunified with R.D.T. However, that goal was later changed to adoption on July 2, 2015, which the trial court approved on July 6, 2015.

On October 3, 2016, the state filed a petition to terminate R.D.T.'s parental rights and to certify the children as available for adoption. The petition alleged that R.D.T. failed to adequately participate in her case plan or demonstrate substantial improvement in redressing the problems which led to her children being adjudicated as children in need of care; that she failed to provide court-ordered

2

support for her children for a period in excess of six months, which demonstrated an intent to permanently avoid parental responsibility for the children pursuant to La.Ch.Code art. 1015(4)(b);[2] and that she failed to maintain significant contact with the children for a period of six months, which demonstrated an intent to permanently avoid parental responsibility for the children pursuant to La.Ch.Code art. 1015(4)(c).[3] The mother, through her attorney, answered the petition, denying the allegations set forth by the state.

Following a two-day trial on the merits, the trial court took the matter under advisement. Thereafter, it rendered written reasons, terminating R.D.T.'s parental rights based on a finding that she failed to substantially comply with her case plan and that there is no reasonable probability of her complying with the case plan in the near future. A written judgment finding that R.D.T.'s parental rights should be terminated; that it was in the best interest of the minor children that R.D.T.'s parental rights be terminated; and that the minor children be certified as available for adoption was rendered by the trial court on February 7, 2018. It is from this judgment that R.D.T. appeals.

On appeal, R.D.T. raises two assignments of error committed by the trial court:

1. The trial court erred in terminating the parental rights of the mother, R.D.T., when the evidence produced by the State (and by the defense) at trial was insufficient to prove by clear and convincing evidence that she has not substantially complied with her case plan and that there was no reasonable expectation for further improvement in her condition or conduct in the near future nor reasonable expectation that she would complete the

---

[2] Louisiana Children's Code Article 1015(4)(b) was redesignated La.Ch.Code art. 1015(5) pursuant to 2016 La. Acts No. 608 § 1.

[3] Louisiana Children's Code Article 1015(4)(c) was redesignated La.Ch.Code art. 1015(6) pursuant to 2016 La. Acts No. 608 § 1.

case plan as deemed necessary for the safe return of the children.

2. The trial court erred in terminating the parental rights of the mother, R.D.T., after it failed to find that termination was in the best interest of the children.

## OPINION

In *State in the Interest of J.A.*, 17-500, pp. 3-4 (La.App. 3 Cir. 1/4/18), 237 So.3d 69, 72, this court stated with regard to the termination of parental rights:

A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id.* Because termination of parental rights is a severe action, the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be established." *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id.*; La.Ch.Code art. 1037.

A judgment terminating parental rights is reviewed on appeal under the manifest error standard of review. *State in the Interest of K.V.*, 14-163 (La.App. 3 Cir. 11/21/14), 161 So.3d 795.

The grounds for terminating the parental rights of a parent are set out in La.Ch.Code art. 1015, and include:

(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

4

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

(6)     Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

The state's burden of proof is by clear convincing evidence. La.Ch.Code art. 1035. Lack of compliance with an approved case plan can be proven by the following grounds:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Ch.Code art. 1036(C).

5

Additionally, La.Ch.Code art. 1036(D) provides that "lack of any reasonable expectation of significant improvement in the parent's conduct in the near future" may be proven by:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

Pursuant to La.Ch.Code art. 1037(B), "[w]hen the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven." Thus the state's burden is two-fold.

**FIRST ASSIGNMENT OF ERROR**

In her first assignment of error, R.D.T. argues that the trial court erred in terminating her parental rights based on its finding that the state proved by clear and convincing evidence that she failed to substantially comply with her case plan and that there was no reasonable expectation of improvement in her conduct or condition in the near future.

In its December 31, 2014 report, DCFS's case plan required R.D.T. to secure and maintain suitable housing and legal income and resources to provide for her children; to become stable on her medication in order to demonstrate that she was mentally and emotionally capable of protecting and caring for her children; for her

6

to refrain from substance abuse, submit to random drug screens, and to be evaluated for substance abuse treatment; for her to participate in an anger management program in order to learn and practice alternate ways to express anger and handle conflicts; and for her to meet monthly in her home with a case worker in order to discuss her case plan, her progress in achieving the goals of the case plan, and changes in her circumstances.

According to all of DCFS's reports, the most success R.D.T. achieved in working her case plan occurred prior to its December 31, 2014 report. R.D.T. underwent detox and in-patient substance abuse treatment at Red River Treatment Center/Pathways, including a short anger management program. However, DCFS indicated that R.D.T. had not completed her anger management goal, as the depth of this program was unknown, and that she had not undergone random drug screens since this treatment. The December 31, 2014 report further indicated that R.D.T. had a violent episode subsequent to the completion of this treatment, which required police intervention. She had three visits with her children and stayed with R.T. while she was in the hospital undergoing umbilical hernia surgery.

DCFS's reports reveal that R.D.T. failed to maintain or secure suitable housing and employment while working her case plan. She was arrested on three different occasions: 1) on January 13, 2015, for shoplifting and contempt of court; 2) in April 2015, for violation of her Texas parole, after which she was returned to Texas and incarcerated through August 26, 2015; and 3) on December 23, 2015, for shoplifting. She was incarcerated in Alexandria beginning on November 21, 2016, and was released some time before DCFS's July 10, 2017 report. At that time, she was living with a friend, but had not obtained employment. By the December 27, 2017 report, R.D.T. reported that she had housing and a job, but

7

DCFS was unable to verify this information. These reports further indicate that contact between R.D.T. and her case worker was sporadic.

Kimberly Lyles, the DCFS case worker, testified that she was assigned this case in January 2015. She stated that because R.D.T. never obtained stable housing she was never able to conduct a home visit with her. With regard to employment, she stated that R.D.T. informed her in September 2017, that she was working at a McDonald's in Lafayette, Louisiana, but that she later reported being back in Alexandria by October 2017. On January 8, 2018, Ms. Lyles said that she received a letter from an employer stating that R.D.T. was employed working twenty hours a week as a sitter for an elderly women, but she said that she was unable to verify that information. Ms. Lyles further testified that prior to the start of this trial, R.D.T. presented her with an address for where she was living and informed her that that she was scheduled for a job interview in Natchitoches later that week.

Ms. Lyles testified that she was aware that R.D.T. previously had a drug problem, but she felt that R.D.T. had completed her substance abuse program. She stated that she had no information to indicate that R.D.T. has not been clean since this 2016 program, but she was also not aware of her undergoing any subsequent drug screens. Ms. Lyles further testified that R.D.T. underwent a mental health examination and was prescribed medication as a result of the examination. She stated that although R.D.T. signed a medical release for her, she was unable to obtain her records.

Ms. Lyles testified that R.D.T. failed to satisfy her court-ordered monthly child-support payments of $10.00 or $25.00, depending on whether she was employed. She stated that contact with R.D.T. has been sporadic because R.D.T. was missing for periods of time and that all of her contact had to be initiated by

8

R.D.T., who communicates through a telephone app. She said that her inability to communicate with R.D.T. greatly affected her ability to monitor R.D.T.'s mental health and to request random drug screens. She stated that none of the phone numbers or addresses provided over the years by R.D.T. turned out to be viable.

Ms. Lyles testified that visitation between R.D.T. and her children was initially scheduled for once a month. However, she stated that visitation never occurred while R.D.T. was incarcerated. She stated that after R.D.T.'s release from prison, visitation would only occur when R.D.T. contacted her and requested a visit. She stated that R.D.T. last visited her children in June 2017, at a McDonald's, which was for R.A.T.'s birthday. Ms. Lyles testified that during the visit, R.D.T. caused a scene when she accused one of the foster parents of hitting R.T.

R.D.T. admitted that she has been involved with DCFS since 2006. She further admitted that she has been unable to obtain housing during the majority of her case plan because her criminal record prevented her from gaining employment and the funds needed to maintain a home. She testified that she is currently living at the Agape House in Alexandria, which is a recovery home for addicts run by a pastor. She stated that she shares the home with the pastor and three other persons, one being her older daughter. She said that she is the only recovering addict living in the house. R.D.T. testified that the pastor told her that her children could live with her in the home. She stated that she shares a kitchen with the other residents, but she has access to two bedrooms containing three beds. She said that another bedroom would open up once her daughter moves out. R.D.T. testified that if she is required to find her own place in order to be reunited with her children, she would do so. However, she said that she would rather remain at the Agape House.

9

She further testified that she is not able to afford a telephone at this time and that she is only able to communicate via Wi-Fi, through an internet text app.

R.D.T. testified that she works twenty hours a week, sitting with an elderly blind lady. However, she stated that she has applied for a job with Roy O. Martin Lumber Company, which hires convicted felons. She stated that she was contacted the week before by Roy O. Martin to take a test and undergo a physical. Once she begins this job, she stated that a bus would pick her up every day in Alexandria and take her to her job in Chopin, near Natchitoches. Previously, R.D.T. testified that she worked for three weeks at an IHOP restaurant, making $2.15 per hour plus tips. She stated that she quit because she was not making enough money. She said that she also worked at a McDonalds for forty-five days, while she was living in a half-way house in Many. She said that she quit this job when she moved back to Alexandria. Based on her employment history, R.D.T. testified that she was unable to pay the court-ordered child support to the state.

R.D.T. testified she completed the mental health requirement of her case plan when she underwent a mental health examination with Dr. Bruce Craig at Red River Treatment Center. However, she admitted that she never transmitted her results to her case worker. As part of this treatment, she stated that she completed courses in anger management and living with depression and bipolar. At the completion of this course, she stated that she moved into a half-way house. R.D.T. testified that she signed a medical release so that her case worker could obtain her records.

R.D.T. testified that her last visit with her children occurred in June 2017. During this visit, she stated that R.T., who was six years old at the time, told her that her foster father was hitting her. R.D.T. testified that she became upset upon learning this because she did not believe that a man should hit a girl and that it was

her understanding that foster parents were not supposed to whip the children. However, rather than informing the case worker, she stated that she confronted the foster parent. After this incident, R.D.T. testified that she did not visit the children again because she was sent to prison on a contempt charge.

Following her release from prison, R.D.T. testified that she went back into substance abuse treatment because she did not want to go back to the same environment she had been in. She explained that the only way she could obtain help was to go into drug rehabilitation and that she had to use marijuana in order to get out of Alexandria and be placed in a half-way house. R.D.T. testified that she used marijuana in August 2017, in order to enter Red River Treatment Center/Pathways. She said that she was in treatment for approximately twenty-eight days, after which she was sent to a half-way house in Many. R.D.T. testified that her case worker was aware of these facts. Although she admitted to having a drug problem in the past, R.D.T. claimed that she has been clean for nearly a year and that she has not been incarcerated for eight months.

R.D.T. acknowledged that while she procrastinated in working her case plan, she did complete her mental health and substance abuse requirements. She testified that she has changed her life and is better now than she was last year. She stated that she wants to be reunited with her children, but admitted that she is financially unable to support them at this time. Based on her current condition, she thought that she could only handle one child at this time.

In its written reasons for judgment, the trial court made the following factual findings:

> For more than ten years, [R.D.T.]'s children have been involved with DCFS. Some of [R.D.T.]'s children are no longer involved only because they have aged out of the system. Her history reveals a pattern of drug use, insufficient housing, no stable employment and no consistent communication or visitation with her children. In this case,

the Court believes she made an effort to work her plan and she loves her children; however, she has not provided the necessary permanence required for her children to grow and thrive. Her pattern continued through this case.

Kimberly Lyles testified that [R.D.T.] did not stay in contact with the agency or have a stable residence. Ms. Lyles could not establish a consistent visitation schedule; she could only set up visits if [R.D.T.] called. While Ms. Lyles testified that [R.D.T.] meet [sic] the substance abuse requirement of her case plan, [R.D.T.] admitted that she used drugs to test positive so she could go to a facility or home in Many in July 2017. Such action suggests that she did not complete the substance abuse requirement. Additionally, [R.D.T.] has been unable to maintain employment. Further, [R.D.T.] testified that she could only care for one of her children at the present time.

This case has been active since February 2014. As of January 2018, [R.D.T.] has not made sufficient progress. She has not substantially complied with her case plan and there is no reasonable probability that she will comply in the future. DCFS met their burden of proof and [R.D.T.]'s rights are terminated, with the children being freed for adoption as to the mother.

After reviewing the record in its entirety, we find no manifest error in the trial court's determination that R.D.T. failed to substantially comply with her case plan or that there is no reasonable expectation that she will do so in the near future. By her own testimony, R.D.T. admitted that she failed to meet the housing and income requirements of her case plan and that she intentionally used drugs after her release from prison in order to obtain further substance abuse treatment. She failed to pay the court-ordered child support payments; she had not visited with her children in excess of seven months, in part due to her incarceration on a contempt charge; and she failed to maintain contact with her case worker. Although R.D.T. testified that she has lately obtained housing and the chance of stable employment, this is four years into her case plan. She further admitted that she was only capable of caring for one child at this time. Accordingly, we affirm the trial court's finding that the state proved by clear and convincing evidence that R.D.T.'s parental rights as to her minor children, R.J., R.T., and R.A.T., should be terminated.

## SECOND ASSIGNMENT OF ERROR

In her second assignment of error, R.D.T. argues that the trial court erred in terminating her parental rights based on the fact that little was said during the trial on the merits with regards to the best interest of the children and because the trial court failed to mention this issue in its written reasons.

Although the trial court's written reasons do not specifically address a finding of whether the termination of R.D.T.'s parental rights was in the best interest of her children, the February 7, 2018 written judgment states, "The Court finds that the termination of the parental rights of [R.D.T] is in the best interest of [R.J.], [R.T.] and [R.A.T.]

In *Wooley v. Lucksinger*, 09-571, 09-584, 09-585, 09-586, pp. 77-78 (La. 4/1/11), 61 So.3d 507, 572, the supreme court stated the "well-settled rule":

> "[T]hat the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment." *Bellard v. American Cent. Ins. Co.*, 2007-1335 p. 25 (La.4/18/08), 980 So.2d 654, 671; *Greater New Orleans Expressway Commission v. Olivier*, 2002-2795 p. 3 (La.11/18/03), 860 So.2d 22, 24 ("Appeals are taken from the judgment, not the written reasons for judgment."); La. C.C.P. arts. 1918, 2082 and 2083. Judgments are often upheld on appeal for reasons different than those assigned by the district judges. "The written reasons for judgment are merely an explication of the trial court's determinations. They do not alter, amend, or affect the final judgment being appealed. . . ." *State in the Interest of Mason*, 356 So.2d 530, 532 (La.App. 1 Cir.1977).

Thus, it is the trial court's judgment that is the subject of this appeal, not the reasons for judgment. La.Code Civ.P. art. 2082 The judgment herein specifically held that it was in the children's best interest that R.D.T.'s parental rights should be terminated and that finding is supported by the record. Despite the fact that there may have been little direct testimony regarding the best interests of the children during the trial on the merits, the trial court had the benefit of the numerous reports from DCFS and CASA in which to determine whether the

13

termination of R.D.T.'s parental rights was in the best interest of the children. Both DCFS's and CASA's reports recommend that it would be in the best interests of the children if R.D.T.'s parental rights were terminated.

The record indicates that R.J., who is eleven years old, is currently in her sixth foster home and that she experiences difficulty both at home and at school due to her attitude. She has difficulty with her class work and has received tutoring and counseling in the past. She is currently on medication for ADHD, bed wetting, and depression. R.T., who is six years old, has been in the same foster home for most of her stay in the state's custody and does well both socially and academically in school. Her foster parents wish to adopt her. R.A.T., who is four years old, has been diagnosed with autism, has difficulty with speech, and receives speech and special education therapy. He experiences multiple problems at school due to his inability to focus, failure to follow rules, and is defiant, manipulative, and refuses to take part in class activities. His foster mother related that she is frequently required to pick him up from school due to his behavior.

Perhaps the most poignant consideration here is the position of the children, as represented by counsel throughout these proceedings. That wish, succinctly stated, is that they "wish to be free from the requirements of [DCFS] either through their mother's successful completion of her plan or adoption[,]" and they "leave whether their mother has adequately worked her plan to the remit of the Court but beg to have permanence at the earliest possible time." While R.D.T. testified that she loved her children and wanted to be reunited with them, she also was unsure if it would be better for the children to remain in the state's custody rather than be returned to her. She further admitted that she could only care for one child based on her current situation.

14

Our juvenile justice system places paramount importance on the best interests of the children involved and is designed to protect their rights to "thrive and survive." *State in the Interest of S.M.*, 98-922, p. 14 (La. 10/20/98), 719 So.2d 445, 452. Thus, although parental rights are protected by the enforcement of procedural rules enacted to insure that they "are not thoughtlessly severed" in a termination hearing, those rights "must ultimately yield to the paramount best interest of the children" if the failure to terminate the parental rights would "prevent adoption and inhibit the [children's] establishment of secure, stable, long term, continuous family relationships." *Id.*

Based on the foregoing evidence, we find no manifest error in the trial court's judgment that the termination of R.D.T.'s parental rights was in the best interest of her children.

## DISPOSITION

Based on the foregoing reasons, the judgment of the trial court terminating R.D.T.'s parental rights and certifying the minor children as available for adoption is affirmed. All costs associated with this appeal are assessed to R.D.T.

**AFFIRMED.**

15