NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-801

STATE IN THE INTEREST OF B.H.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. J-2289-2017
HONORABLE C. ANTHONY EAVES, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

VAN H. KYZAR
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Van H. Kyzar, and Jonathan W. Perry, Judges.

AFFIRMED.

**Annette Roach**
**724 Moss Street**
**Lake Charles, LA 70601**
**(337) 436-2900**
**COUNSEL FOR APPELLANT:**
    **L.H. (Mother)**

**Guy R. Lain**
**1721 Carter Street**
**Vidalia, LA 71373**
**(318) 336-8611**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana, Department of Children & Family Services**

**Trisha Casey**
**Acadiana Legal Services**
**1020 Surrey Street**
**Lafayette, LA 70501**
**COUNSEL FOR APPELLEE:**
    **B.H. (Child)**

**KYZAR, Judge.**

The mother, L.H.,[1] appeals from a trial court judgment terminating her parental rights based upon a finding that she failed to substantially comply with her case plan, that there was no reasonable expectation of her complying with her case plan in the near future, and that it was in the best interest of her child that her parental rights be terminated. For the following reasons, we affirm.

## DISCUSSION OF THE RECORD

On April 2, 2018, the State of Louisiana, through the Department of Children and Family Services (DCFS), filed a petition to terminate the parental rights of L.H. (the mother) and S.E. (the father) to their minor child, B.H., whose date of birth is July 24, 2015, and to certify the child as available for adoption. Following a hearing on the petition, the trial court rendered judgment, terminating both parents' parental rights and certifying that B.H. was available for adoption. As L.H. was the only party to appeal this judgment, we will only address the evidence as it pertains to the termination of her parental rights.

On February 3, 2017, the trial court received a report that L.H. was being sentenced to sixty days in jail on a conviction of remaining after being forbidden and that she had no one to care for her eighteen-month-old child, B.H.[2] Based on this report, the trial court issued an oral instanter order, ordering that B.H. be taken into the custody of DCFS. Thereafter, the oral instanter order was confirmed on February 8, 2017, at which time the trial court rendered judgment, ordering that B.H. continue

---

[1] The initials of the child and his parents are used to protect the identity of the minor child. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

[2] In the February 6, 2017 affidavit submitted in support of the instanter order, the DCFS employee stated that another DCFS worker had interviewed B.H.'s maternal grandmother and maternal aunt and that both stated that they were unable to care for B.H.

in the custody of DCFS. On February 22, 2017, DCFS filed a petition seeking to adjudicate B.H. as a child in need of care.

On March 3, 2017, DCFS finalized L.H.'s case plan at the first Family Team Meeting (FTM). The case plan indicated that L.H. was not present at this meeting. The primary goal of the case plan was reunification, with a secondary goal of adoption. B.H. had been placed in a certified foster home in Alexandria by the time of this meeting.

The case plan set out the following Adult Functioning behavioral goals for L.H.:

1.  To obtain and maintain safe and stable housing with adequate food, space, working utilities, running water and [to] be free of all safety, health, and structural hazards.

2.  To obtain and maintain legal employment that is sufficient to meet the needs of the child and provide proof of income to the agency.

3.  To allow the worker to complete announced and unannounced visits according to the Structure Decision Making (SDM) with at least one in-home visit. L.H. will contact the caseworker twenty-four hours in advance if visit needs to be rescheduled.

4.  Will complete a substance abuse assessment at Pathways and a Mental Health assessment at Caring Choices and follow all recommendations for both assessments. L.H. will submit to drug screens on the designated day and understand that failure to complete a drug screen will result in a positive drug screen. L.H. will sign consents allowing the agency to obtain her substance abuse and mental health assessments, recommendations, drug screens, and progress notes.

5.  Will resolve all legal issues.

6.  Will keep the agency informed of changes to her address, telephone number, or any other significant changes. L.H. will inform the agency within twenty-four hours of the change.

The case plan further set out the following Parenting Practices behavioral goals:

1.  Will demonstrate fiscal responsibility by contributing payments toward the cost of the child's care while in foster care. L.H. will contribute $25.00 (if employed) and $10.00 (if unemployed) a month.

2

2.    Will attend, participate, and successfully complete parenting classes with Project Celebration.

3.    Will attend and participate with all Family Team Meetings (FTM), court hearings, family visits, and any other appointment the agency deems as necessary and ask questions of anything concerning the FTM and other services needed. L.H. will notify the agency twenty-four hours in advance if she is unable to attend scheduled appointments or if transportation is needed.

4.    Will visit her child according to the visitation contract.

B.H. was adjudicated as a child in need of care on April 11, 2017, and the trial court ordered that his custody continue with DCFS. On May 3, 2017, the trial court approved the March 3, 2017 case plan and its goal of reunification, with a secondary goal of adoption.

In her July 21, 2017 report to the trial court, Marie Alexander, the child welfare specialist, reported that B.H. was in his third certified foster home in Alexandria, and that he was flourishing and had developed a bond with his foster mother. She further reported that the foster mother was committed to retaining B.H. in her home.

Ms. Alexander noted that L.H. had returned to her mother's home after she was released following her incarceration. However, Ms. Alexander indicated that DCFS did not consider this home a stable environment for B.H. due to the history between L.H. and her mother and the fact that it was from this home that L.H. was arrested after she refused to leave the premises. However, she noted that the home was clean, stocked with food, and had working utilities. Ms. Alexander noted that L.H. had no proof of income. She reported that L.H. stated that she was a stay at home mother and that she made ends meet by performing odd jobs, such as braiding hair, and relying on family and community resources. She further reported that L.H. had made no contributions to the cost of the B.H.'s care in foster care.

3

Ms. Alexander indicated that L.H. had made sporadic contact with DCFS over the past six months. Although L.H. was released from prison on March 4, 2017, she failed to contact DCFS until March 23, 2017. She noted that L.H. did not own a cell phone and had provided DCFS with her mother's cell phone number. Ms. Alexander reported that she mainly communicated with L.H. through letters sent to her mother's address. She noted that L.H. would occasionally contact her on her mother's cell phone or would show up at the office if she had something to discuss with her.

Ms. Alexander reported that L.H. refused to cooperate with case workers when B.H. was first taken into custody. At the first in-home visit to deliver her case plan on April 3, 2017, she noted that L.H. became agitated and that the visit ended prematurely. She reported that L.H. was available for a home visit on May 3, 2017, but was unavailable on June 8, 2017, and refused to open the door to her the next day. At the rescheduled home visit on June 16, 2017, she reported that L.H. was about to leave to run errands, but allowed a walk-through of the home and promised to stop by DCFS's office later that day to complete the visit. Ms. Alexander noted that L.H. failed to follow through on this promise. During a June 27, 2017 family visit, Ms. Alexander indicated that she tried to reschedule a home visit for June, but that L.H. became loud and agitated and claimed that she had already had a home visit for June. L.H. was not available for a home visit in July 2017.

Ms. Alexander reported that L.H. refused to submit to a random drug screen on April 4, 2017, because she did not feel like going, although she was offered transportation. Ms. Alexander noted that although she tried to explain the concept of random drug screens, L.H. accused her of trying to make her angry and shut the door in her face. Ms. Alexander reported that L.H. refused transportation for a random drug screen on April 5, 2017, but requested transportation for a family visit

4

later that day. She noted that L.H. showed up for a drug screen on April 28, 2017. Although the screen was not requested by DCFS, she noted that it approved the paperwork for the screen, but requested that a hair follicle test be performed in place of a urine analysis. However, L.H. refused to submit to the hair follicle test. L.H. submitted to a random drug screen on May 24, 2017, which was negative. On June 14, 2017, she refused to submit to a random drug screen because she had other things to do.

Ms. Alexander noted that L.H. completed a substance abuse assessment on May 24, 2017, at which time she was not recommended for substance abuse treatment, but was highly recommended for a mental health assessment. She noted that L.H. attended the orientation for the mental health evaluation on June 5, 2017, but failed to attend the next appointment on June 21, 2017.

Ms. Alexander reported that L.H.'s first visit with her son occurred on March 23, 2017. She noted that L.H. had not missed any visits with her son, whether they occurred at her parenting classes or at DCFS's office. She indicated that L.H. began her parenting classes on April 25, 2017, and had three classes left to complete. She reported that L.H. completed her anger management classes on July 18, 2017. Although Ms. Alexander reported that L.H. attended the first FTM in March 2017, which was conducted where she was incarcerated, the March 3, 2017 case plan indicates that L.H. could not be located. She further indicates that L.H. did not attend the July 18, 2017 FTM, but that she appeared at all court dates.

On August 9, 2017, the trial court rendered a case review judgment, finding that B.H. was in continued need of care and approved DCFS's case plan and its concurrent goals of reunification and adoption.

The next FTM was held on December 27, 2017, at which L.H. was not present. By this time, L.H.'s case worker was Gladys McQueen. In the December 27, 2017

5

case plan, Ms. McQueen noted that the current goals of the case plan remained reunification and adoption. She noted the following:

> [L.H.] was incarcerated for a short period of time. Upon her release, she has been living with friends. Caseworker has not been able to assess any home for safety issues. [L.H.] has not completed her Mental Health assessment. [L.H.] also has not attended some random drug screens when requested. [L.H.] has not made any parental contributions to the cost of care. [L.H.] has not kept the agency aware of significant changes.

On January 3, 2018, following a case plan review hearing, the trial court rendered a permanency review judgment, finding that B.H. continued to be a child in need of care. It further approved the December 27, 2017 case plan and its goals of reunification and adoption.

On April 2, 2018, the state filed its petition to terminate the parental rights of L.H. and S.E. and to have B.H. certified as available for adoption. The petition alleged that the parents failed or refused to adequately participate in the services provided or to substantially comply with the case plans provided by DCFS; that they failed to provide significant contributions to the care and support of B.H. in excess of six months, thus proving their intentions to permanently avoid their parental responsibility within the meaning of La.Ch.Code art. 1015(5)(b); that they failed to have significant contact with B.H. for a period of six months, which proved their intention to avoid their parental responsibility within the meaning of La.Ch.Code art. 1015(5)(c); and that it was in the best interest of B.H. that their parental rights be terminated. Although a hearing was set in this matter for May 21, 2018, the trial court, on its own motion, rescheduled the matter for July 11, 2018.

In its June 28, 2018 report to the trial court, Jaleesha Rundel, the latest case worker, noted that the case was transferred from the Vernon DCFS to the Rapides DCFS on April 18, 2018. Ms. Rundel reported that L.H. was currently residing with her mother in Leesville, and that her home appeared to be clean, stocked with food,

6

and with working utilities. She noted that L.H. was not employed, but that she said she was receiving income by doing hair, babysitting, and cleaning homes. L.H. further indicated that she was receiving monthly SNAP benefits.

Ms. Rundel noted that she had verified on June 15, 2018, that L.H. had attended the orientation for her mental health evaluation on June 5, 2017, but that she failed to return for the next scheduled appointment on June 21, 2017. She indicated that L.H. stated at the June 27, 2018 FTM, that she would schedule an appointment for a mental health evaluation by submitting a packet to Caring Choices the next day. She further indicated that L.H. submitted a urine sample on May 17, 2018, which was negative, but that she refused to submit to a hair follicle analysis.

Ms. Rundel further noted that L.H. had maintained contact with DCFS during the nearly two months that the case had been administered by the Rapides DCFS and that she had conducted visitation with B.H. and participated in her monthly visits with her caseworker. She indicated that at the June 27, 2018 FTM, L.H. stated that she had mailed $20.00 in parental contributions on June 21, 2017, and that she planned on sending another payment that week.

In the June 27, 2018 case plan, which was finalized at the FTM of that same date, the goal of the case plan was listed as adoption. In addition to the information contained in her June 28, 2018 report, Ms. Rundel stated that L.H. had not resolved her legal issues because she was arrested in May 2018, for interference with medical treatment, for which she had a July 11, 2018 court date.

Following a case review hearing on July 11, 2018, the trial court rendered a judgment, finding that B.H. continued to be a child in need of care. A hearing was held that same day on the petition to terminate the parental rights and to certify B.H. as available for adoption. At the close of the hearing, the trial court ruled that the state proved by clear and convincing evidence that both parents failed to

7

substantially comply with their case plans and that there was no reasonable expectation of significant improvement in either parent's conduct or condition in the near future, especially with regard to L.H. The trial court further held that it was in the best interest of B.H. that the parental rights be terminated. Finally, the trial court certified B.H. as available for adoption. A written judgment was rendered by the trial court on July 30, 2018. It is from this judgment that L.H. appeals.

On appeal, L.H. raises two assignments of error:

1) The trial court erred in terminating the parental rights of L.H., when the evidence produced by the State was insufficient to prove by clear and convincing evidence that she had not substantially complied with her case plan and there was no reasonable expectation for further improvement in the mother's condition or conduct in the near future nor reasonable expectation that the mother would complete the requirements of the case plan as deemed necessary for the safe return of her child.

2) The trial court erred in finding that termination was in the best interest of the child.

## OPINION

The elements required for the termination of parental rights are well defined in our law and jurisprudence.

A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id.* Because termination of parental rights is a severe action, the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be established." *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id.*; La.Ch.Code art. 1037.

8

*State in the Interest of J.A.*, 17-500, pp. 3-4 (La.App. 3 Cir. 1/4/18), 237 So.3d 69, 72.

The grounds for terminating the parental rights of a parent are set out in La.Ch.Code art. 1015, and include:

(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

The state's burden of proof is by clear and convincing evidence. La.Ch.Code art. 1035(A). Lack of compliance with an approved case plan can be proven by the following grounds:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

9

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Ch.Code art. 1036(C).

Additionally, La.Ch.Code art. 1036(D) provides that "lack of any reasonable expectation of significant improvement in the parent's conduct in the near future" may be proven by one or more of the following conditions:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

Pursuant to La.Ch.Code art. 1037(B), "[w]hen the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven." Thus, the state's burden of proof is two-fold.

10

A judgment terminating parental rights is reviewed on appeal under the manifest error standard of review. *State in the Interest of K.V.*, 14-163 (La.App. 3 Cir. 11/21/14), 161 So.3d 795.

## ASSIGNMENT OF ERROR NUMBER ONE

In her first assignment of error, L.H. argues that the trial court erred in terminating her parental rights based on its finding that the state proved by clear and convincing evidence that she failed to substantially comply with her case plan and that there was no reasonable expectation of improvement in her conduct or condition in the near future.

The state presented the testimony of the two latest case workers in support of its petition to terminate L.H.'s parental rights: Gladys McQueen and Jaleesha Rundel. Ms. McQueen testified that she was assigned this case from November 2017 through May 2018. She stated that the original goal of B.H.'s case plan was reunification, and that L.H.'s case plan required her to participate in services and to demonstrate a change in her circumstances in order to regain custody of B.H.

Ms. McQueen testified that L.H. moved at least five times and was incarcerated two times during her involvement in the case. She testified that L.H. was jailed on a charge of possession of marijuana from August 2017 through September 13, 2017, and then was released on bail. She stated that L.H. was then incarcerated from November 14 through December 4, 2017, on the drug conviction.

Ms. McQueen testified that L.H. was living at her mother's home at the start of her involvement in this case. She stated that she attempted to conduct home visits at this location, but that L.H. often refused to open the door. She stated that at times, L.H. would not open the door even though she heard her talking over the loud music playing in the house. Ms. McQueen testified that she was not aware that DCFS had

11

previously told L.H. that it did not consider her mother's home as suitable housing for her and B.H. based on her past relationship with her mother.

Ms. McQueen testified that in July 2017, L.H.'s mother reported that L.H. was forbidden from living with her after she found drugs in her home and because L.H. failed to follow her rules and wanted B.H.'s father to live there. Ms. McQueen stated that upon L.H.'s September 13, 2017 release from jail, she claimed that she returned to her mother's home; however, she (Ms. McQueen) was unable to verify this information. Thereafter, she stated that L.H. reported that she was living in hotels and with friends, and she conducted one home visit with L.H. at a local hotel in December 2017.

Ms. McQueen testified that L.H. told her on February 23, 2018, that she was living at 424 Bradley Street in Leesville, an address which she and her supervisor determined did not exist. On February 28, 2018, L.H. told her that she was living at 169 Maurice Street in Leesville. Ms. McQueen testified that L.H. was at this address but would not allow her to conduct a home visit without first gaining the homeowner's permission. She stated that by March 22, 2018, L.H. was staying with another friend and refused to give her this address.

Ms. McQueen testified that L.H. never provided her with proof that she was employed, instead, she stated that L.H. informed her that she was trying to start up an online retail business and that she made money by braiding hair, which money she used to pay for her hotel rooms. She said that L.H. who was pregnant during this time, further complained that no one would hire her because she was pregnant.

Ms. McQueen testified that L.H. underwent a substance abuse evaluation in May 2017, at Pathways in Leesville, but that the evaluator, Charlotte Brady, felt that L.H. should address her mental health issues before addressing her substance abuse issues. She stated that this was based on statements L.H. made during her substance

12

abuse evaluation that she was having conversations with persons that no one else could see and that the Central Intelligence Agency had inserted implants in her body. Ms. McQueen testified that she met L.H. at the Leesville City Jail on November 29, 2017, while she was incarcerated, and that L.H. recounted that she had cords coming out of her back and that people were attached to her such that she needed to undergo a body scan in order to unhook them.

Ms. McQueen testified that L.H. attended a mental health evaluation with Caring Choices on June 5, 2017, at which time she was told to apply for Medicaid in order to receive these services. She stated that L.H. complained to a DCFS worker that DCFS had terminated her Medicaid, but she was informed that DCFS had no such authority and that if she would apply for Medicaid, it would pay for her mental health services. However, Ms. McQueen testified that L.H. never applied for Medicaid and missed her June 21, 2017 appointment as a result. She said that L.H. made no further attempt to satisfy her mental health goal between June 21, 2017 and November 29, 2017, the date of her incarceration, which failure greatly impacted her case plan.

Ms. McQueen testified that L.H. refused to submit to numerous requests for random drug screens. She stated that L.H. refused to submit to six drug screens, was positive once for cocaine; and was negative for drugs on three occasions. She stated that L.H. also refused to submit to two hair follicle tests and was positive once for cocaine and benzos. She explained that DCFS requests this test if a parent is non-compliant with their drug screens. Ms. McQueen also testified that L.H. accused DCFS of making her "stems" positive for drugs as the reason for her refusal to submit to the hair follicle test on occasion.

Ms. McQueen testified that she mostly communicated with L.H. by telephone. She stated that although she always sought contact numbers, the numbers provided

13

by L.H. either changed or were non-working numbers. When this happened, she said that she could not communicate with L.H. until L.H. contacted her. Ms. McQueen testified that she told L.H. that it was important that she be able to contact her, especially when it concerned scheduling random drug screens. She stated that other than the home visit she conducted at the hotel, she also visited L.H. when she was incarcerated.

Ms. McQueen testified that L.H. made no financial contributions to B.H.'s care while she was involved in her case. She said that L.H. claimed that she could not afford the contributions because no one would hire her because she was pregnant. She further stated that L.H. attended the first FTM, but failed to attend the next two meetings, held on July 19, 2017 and December 27, 2017. Ms. McQueen testified that L.H. visited with B.H., both during her parenting classes and at DCFS's office. She stated that L.H. interacted very well with B.H. at times, but at other times she would just stare at him or cry.

Ms. Rundel testified that she was assigned to this case on April 18, 2018. She stated that L.H. reported that she was living at her mother's home at 1312 Oaks Drive in Leesville, which she visited on June 7, 2018. She said that the home was clean with working utilities and was stocked with food. Ms. Rundel testified that L.H.'s two teen-aged daughters also lived there, one of which was present during the visit.[3] Although L.H. indicated that she slept on a couch in the living room, Ms. Rundel testified that she saw none of L.H.'s personal belongings in that area. She said that during the visit, L.H., who kept her purse on her shoulder, sat on the couch and removed papers from a couple of bags located in the corner of the room.

---

[3] Ms. Rundel testified that she was unaware that L.H. had a third child, who also lived with her mother.

14

Ms. Rundel testified that L.H. informed her during this visit that she was searching for her own housing because she intended to move to either Lake Charles or Alexandria. She stated that she was not aware that L.H. was employed or could afford to move. She further admitted that she never contacted L.H.'s mother to verify that L.H. was living with her because she did not have her mother's contact information.

Ms. Rundel testified that L.H. has not completed either the substance abuse or the mental health requirements of her case plan. She stated that she told L.H. to make an appointment for a substance abuse evaluation but was informed by L.H. that the Pathways in Leesville was closed. She said that she then contacted the Rapides Parish Pathways and Caring Choices and was told by Caring Choices that L.H. should call and schedule an appointment. Ms. Rundel testified that she passed this information on to L.H. on June 15, 2018. She stated that L.H. told her on June 27, 2018, that she had picked up a packet from Caring Choices, but had not yet turned it in.

Ms. Rundel testified that L.H.'s most recent drug screen was negative on May 17, 2018, but that she had refused to submit a hair follicle test. She explained that a hair follicle test indicates whether a person is using drugs or is around other people who are using them. She further stated that the test would help DCFS determine if L.H. required substance abuse therapy.

Ms. Rundel testified that L.H. had consistently kept in contact with her. She stated that if L.H. does not answer her call, she usually called back within thirty minutes. She further stated that she was informed by L.H.'s instructor that she had completed her parenting classes. Ms. Rundel testified that L.H. attended the June 27, 2018 FTM by telephone. She stated that during that meeting, L.H. indicated that she would be submitting the substance abuse packet to Caring Choices the next day.

15

She reported that she was still living with her mother, still unemployed, and that she received income from braiding hair, babysitting, and cleaning houses, and she also received monthly SNAP benefits. Ms. Rundel testified that L.H. sent her a picture on June 21, 2018, of a $20.00 money order and documentation for parental contributions, but that L.H. told her during the FTM that she had not yet sent it, but would send it the next day. However, Ms. Rundel stated that she had received no verification that the payment was made.

Ms. Rundel testified that L.H. has twice visited B.H. since her involvement in this case. She stated that at first, B.H. was distant with L.H., but that he began interacting with her after she grabbed and kissed him. Ms. Rundel testified that at the first visit, L.H. and B.H. watched cartoons on her phone. She stated that L.H. brought clothes and food for B.H. and they painted together during the second visit.

Ms. Rundel testified that DCFS knew about L.H.'s latest pregnancy and that it was considered to be a high risk pregnancy. She stated that L.H. told her that she was unable to keep some appointments because of her pregnancy. However, she said that L.H. never explained why her pregnancy was considered high risk, provided any medical records to support this finding, nor requested that she obtain these records from her physician. She stated that DCFS was aware that L.H. lost this child in May 2018.

L.H. testified at the hearing against the advice of her counsel. She stated that she was familiar with the goals of her case plan, in fact, she admitted that she had worked an earlier case plan involving her older children. She stated that she completed her parenting classes by September 2017. L.H. testified concerning her substance abuse goal as follows:

> Well, I went once in 2015 and they sent a letter saying I don't qualify for a substance abuse treatment. And then again in 2017 we –
> I – I had an appointment June the 5th, and they did urine then as well,

16

and I talked to a counselor that day and that's how the statement from the counselor came. They just kind of went a little bit backwards. Then I had another appointment June, I believe, the 24th, then I had another urine, a negative result. And that was my orientation and so the next appointment that I – that I'm able to go to would be – being prescribed meds, but the – my counselor didn't – didn't – I didn't qualify for the substance abuse treatment part. But they let me go through the orientation with – to see if anything was wrong with my – the mental health part. But at that visit I found out that my insurance was cut off and so I wasn't able to make the next appointment.

L.H. testified that she maintained contact with DCFS. Although she did not initially have a phone, she stated that she maintained contact through her mother's phone number. She stated that her worker would call her mother and then her mother would inform her that she needed to contact her worker. L.H. testified that she met with her worker at least three times a month beginning in June and until she was incarcerated in August 2017; that she met with her worker during her parenting classes, which occurred every Tuesday for approximately fourteen weeks; and that she also met with her worker during her visits with B.H., which occurred every other week, either at DCFS's office or at the parenting classes.

L.H. testified that she submitted to two hair follicle tests. She stated that the latest one occurred in March or May 2018, at which time she also submitted a urine sample. She said that her urine sample was negative and that she knew that her hair follicle was also negative. L.H. testified that despite these negative results, DCFS requested that she submit to another hair follicle test. She stated that she asked why she had to submit to another hair follicle test if DCFS had already received a negative hair follicle result. She said that she did not want to continue cutting her hair.

L.H. testified that she hoped that the trial court would allow her to continue working her case plan and that she was ready to reunite with B.H. She stated:

I don't have a understanding of him not being placed back into my care even with a case plan. Just like my other children are at home and I worked my case plan. I could have worked it with him as well. I – I

17

don't have to go any – there's not a place that I just have to be that my son can't be with me.

L.H. testified that she has three other children, aged seventeen, sixteen, and nine years old. She stated her two youngest children were currently living with her mother, while her older child was living in New Llano with "a loved one." She said that although her older children live with her mother, she and her mother had a co-parenting situation. L.H. testified that her children lived with her as follows:

They live with my mom but I'm active in their life. I was present – I – from August, 2000, they've lived with me their whole life until March, 2016, and from then until June 2016 I wasn't present. I was in Lake Charles. I came home June 2016, and then I left my mom's home those summer months and returned back August, 2016, and was with them until July – the end of July. I mean, I just told you that wrong, August 2016. The end of July of 2017. And I wasn't – I didn't stay with them in – in the home the last part of the year of 2017. I returned back in April 2018.

She agreed that she was incarcerated most of the latter part of 2017. She explained:

Originally, when I left it was just a disagreement but I didn't – I wasn't planning to stay gone from the home. That's just the day that I left we had a disagreement and a week later I was incarcerated, August. And then I – I was incarcerated again in November 'till December.

L.H. testified that she found out that she was pregnant in August 2017, and that she was initially considered high risk because of her high blood pressure, which she was later able to get under control. She stated that her child, a daughter, was born on April 6, 2018, but that she later died due to complications unrelated to her high blood pressure. She said that she informed her worker about her pregnancy, asked her several times to request her medical records, and that she signed a medical-record's release at her physician's office.

In its oral reasons for judgment, the trial court held that the state satisfied its burden of proof, by clear and convincing evidence, that B.H. had been in the state's custody for more than a year, that L.H. failed to substantially comply with her case plan, and that there was no reasonable expectation of significant improvement in her

condition or conduct in the near future. The trial court further held that it was in the best interest of B.H., considering his age and the need for a safe, stable, and permanent home, that L.H.'s parental rights be terminated. In so holding, the trial court stated as follows:

> L.H. has not met, and there's been no substantial compliance with the case plan whether it's about contribution, whether it be about treatment and rehabilitation. There's just not a substantial improvement. Drug tests that were failed on or refused to take the drug test. The hair follicle test is given because it takes long – longer for the drugs to get out of the hair follicle examination versus a regular, what I want to call a pee cup test. And these conditions that let to the removal of the child are still there and [L.H.] has moved around repeatedly, as testified to.

> And, I mean, it's even concerning – it's concerning to me that I hear – I hear from the Department there's been multiple positive drug screens, and now when [L.H.] gets up there that she was pregnant during those multiple failed drug screens. And, so, that's even more concerning about the substance abuse issue that [L.H.] obviously has. And, so, has not attended and attended all the appointments, and visitations and she's moved, and the whereabouts are just not there, and, so, phone numbers repeatedly changed.

> And, so, the State has met their burden of proof, so I'm gonna terminate parental rights and I'm gonna certify the child for adoption at this point. I believe those are all the findings that I have to make.

> It's not something that I necessarily wanted to do, [L.H.] I gave you another opportunity much to the dismay of many people with the State of Louisiana. And, so – but, you know, it's what the law says. And to be honest, I think, at this point it's – it's really what's best for your child. And in considering the testimony about your failure to comply with case plan and what the law says in 1036, you know, so, I'm gonna terminate.

After reviewing the record in this matter, we find no manifest error in the trial court's termination of L.H.'s parental rights and its judgment certifying B.H. as available for adoption.

L.H. first argues that the state failed to prove, by clear and convincing evidence, that she failed to substantially comply with her case plan. Despite her claims in support of this argument, we find no manifest error in the trial court's finding on this issue. Although the record indicates that L.H. satisfied two of the

19

four goals set out in the "Parenting Practices" section of her case plan,[4] it is very clear that she has never satisfied any of the main goals set out in the "Adult Functioning" section of the plan. She never obtained stable housing or legal employment and has not completed the substance abuse or mental health goals set out in her case plan. Furthermore, she refused to submit to six out of ten requests for random drug screens and two out of three hair follicle tests. Of the four drug screens to which she submitted, one was positive for cocaine; the one hair follicle test she submitted to was positive for cocaine and benzos.

Additionally, although L.H. claims that she was prevented from working her case plan while she was incarcerated, her case plan specifically required her to resolve all legal issues. She failed this requirement as evidenced by her arrest and incarceration, while a charge of possession of marijuana was pending, from August to September 13, 2017, and then her further incarceration on this charge from November 14 through December 4, 2018. Additionally, DCFS's records indicate that L.H. was further arrested in May 2018, on a charge of interference with medical treatment.

Moreover, although the case worker could have conferred with L.H. during either her parenting classes or visitation with B.H., L.H.'s case plan still required her to inform DCFS of all changes to her address, telephone number, or other significant changes. While L.H. may have lived at her mother's address and permitted home studies at that location on May 3 and June 16, 2017, the evidence establishes that she refused to allow home visits by her case worker at this and other locations on numerous occasions. The record further established that DCFS was informed by

---

[4] L.H. completed the suggested parenting classes, and she consistently visited B.H. during the times she was not incarcerated. Although her case plan did not list as a goal that she should attend anger management classes, it is clear that L.H. completed these classes as of July 18, 2017.

20

L.H.'s mother as of July 2017, that LH. was forbidden from living there, due in part to her mother finding drugs in the house. There was evidence, thereafter, that L.H., when not incarcerated, either lived with friends or stayed in hotels and that she refused either to provide DCFS with the addresses or refused to allow it into the locations where she was staying. On one occasion, she provided DCFS with an address which did not exist. It is noted that she allowed one home visit while staying at a local hotel in December 2017; however, it is evident that her brief stay in the hotel would never satisfy her goal of obtaining safe and stable housing.

Finally, the record establishes that L.H. has made no verifiable parental contribution to B.H.'s care while he was in foster care and that she brought him food and clothes on only one occasion, which was during her last visit with B.H. Additionally, while she was required to attend and participate at all FTMs, the record establishes that the only FTM that L.H. attended was on June 27, 2018, which she attended by telephone.

Based on the foregoing, we find no error in the trial court's finding that L.H. failed to substantially comply with the terms of her case plan.

L.H. next argues the state failed to prove, by clear and convincing evidence, that there was no reasonable expectation of improvement in her condition or conduct in the near future. She asserts that between the originally scheduled May 17, 2018 hearing date and the rescheduled July 11, 2018 termination hearing, she exhibited actions disproving the state's claim on this issue. L.H. claims that during this time period she made two parental contributions, allowed a home study, met with her case worker, tested negative in a May 17, 2018 drug screen, obtained a packet from Caring Choices for a mental health evaluation, and attended the June 27, 2018 FTM by telephone.

21

However, the record does not support L.H.'s claim that she actually made two parental contributions for B.H.'s care. According to Ms. Rundel, L.H. originally intended to send the contributions on June 21, 2018, but she admitted during the June 27, 2018 FTM, that she had not done so, but that she would send them the next day. As Ms. Rundel noted, she would know if the contributions were received, and she had received no such verification.

With regard to the June 7, 2018 home study, Ms. Rundel admitted that the home was clean, stocked with food, and had running utilities. However, L.H.'s actions and the circumstances during that visit led her to doubt whether L.H. actually lived there, and L.H. had already been kicked out of her mother's home on one occasion. Moreover, Ms. Rundel reported that L.H. told her that she did not intend to remain in Leesville, as she intended to move to Lake Charles or Alexandria. Finally, L.H.'s mother had informed DCFS at the outset of this matter, that she was unable to care for B.H. and, in fact, was evidently already caring for L.H.'s three older children.

Finally, while the record shows that L.H.'s urine did test negative for drugs on May 18, 2018, it also shows that she refused to submit to a hair follicle test at the same time that she underwent the urine analysis. According to her, she saw no need to continue cutting her hair when DCFS had previously obtained a negative hair follicle result from her. However, based on the record, L.H. refused to submit to a hair follicle test on April 28, 2017; had a positive hair follicle test for cocaine and benzos on March 23, 2018; and refused to submit to the May 17, 2018 hair follicle test. Thus, there is no record of her having a negative result from a hair follicle test. Even if she had already had one negative result, this would not have prevented DCFS from seeking further hair follicle results.

22

Although L.H. met with and communicated with her case worker and obtained a packet from Caring Choices, we find that these few actions are insufficient to prove that there is a reasonable expectation of improvement in her conduct or condition in the near future. Throughout the significant length of this case, L.H. has showed no real willingness to address the issues which prevented her reunification with B.H. It was only near the end, after the initial termination hearing was scheduled and then continued that L.H. addressing some of the issues. However, we find no error in the trial court's finding that L.H.'s actions confirmed her established pattern of behavior of being unable to provide an adequate permanent home for B.H.

Accordingly, we find no error in the trial court's finding that the state proved by clear and convincing evidence that there is no reasonable expectation of improvement in L.H.'s conduct or condition in the near future.

**SECOND ASSIGNMENT OF ERROR**

In her second assignment of error, L.H. argues that the trial court erred in finding that the termination of her parental rights was in the best interest of B.H

> Our juvenile justice system places paramount importance on the best interests of the children involved and is designed to protect their rights to "thrive and survive." *State in the Interest of S.M.*, 98-922, p. 14 (La. 10/20/98), 719 So.2d 445, 452. Thus, although parental rights are protected by the enforcement of procedural rules enacted to insure that they "are not thoughtlessly severed" in a termination hearing, those rights "must ultimately yield to the paramount best interest of the children" if the failure to terminate the parental rights would "prevent adoption and inhibit the [children's] establishment of secure, stable, long term, continuous family relationships." *Id.*

*State in the Interest of R.J.*, 18-332, p. 15 (La.App. 3 Cir. 9/26/18), 255 So.3d 1138, 1147.

Ms. McQueen testified that B.H. was placed in the certified foster home of Ms. Priest, who lived in Alexandria, on May 8, 2017, and that he had developed a great bond with her and that she wanted to adopt B.H. She said that B.H., who was almost three years old, was receiving speech therapy and had been potty trained. Ms.

23

McQueen testified that during his visits with L.H., B.H. would initially cry, but then would interact with her after a while. She stated that L.H. liked to hug and kiss him, but she usually had to grab him in order to do so.

Ms. Rundel testified that B.H. was still living with Ms. Priest, who intended to adopt him when he was cleared for adoption. She stated that B.H. had developed a great bond with Ms. Priest and her family and that he looked to her for any physical or emotional needs. She testified that Ms. Priest reported that there had been some incidents with L.H.; thus, the visitation location was changed to DCFS's office. She stated that there is no contact between Ms. Priest and L.H. outside of L.H.'s visitation with B.H.

In finding that the termination of L.H.'s parental rights was in the best interest of B.H., the trial court stated:

> Also, considering the child's age, and needs, and for the safe, stable, and permanent home, I find that the – I make the findings that the State of Louisiana – it's in the best interest of the child, and the State of Louisiana has met their burden of proof as set forth by 1035, by clear and convincing evidence that it's in the best interest of the child that the parental rights be terminated of both[.]

Based on the record before us, we find no error in the trial court's finding that it was in B.H.'s best interest that L.H.'s parental rights be terminated and that he be certified as available for adoption. The record shows that he is thriving in his foster home and has established a bond with Ms. Priest, who wishes to adopt him and provide the stable home that he needs. Accordingly, we affirm the trial court's judgment finding that it was in the best interest of B.H. that L.H.'s parental rights be terminated.

## DISPOSITION

Based on the foregoing reasons, we affirm the judgment of the trial court terminating the parental rights of L.H. and certifying B.H. as available for adoption. The costs of this appeal are assessed to L.H.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.