# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-5

### STATE IN THE INTEREST OF M.S., M.B., and P.O.

**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. J-2310-2017 A
HONORABLE TONY ALAN BENNETT, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, Shannon J. Gremillion, John E. Conery, and D. Kent Savoie, Judges.

**GREMILLION, J., concurs.**

**CONERY, J., dissents and assigns reasons.**

**REVERSED AND REMANDED.**

**Annette Fuller Roach**
**Thirtieth Judicial District Defender Office**
**724 Moss Street**
**Lake Charles, LA 70601**
**Telephone:  (337) 436-2900**
**COUNSEL FOR:**
    **Appellant - L.N.S. (mother)**

**Jack L. Simms, Jr.**
**P. O. Box 1554**
**Leesville, LA 71446**
**Telephone:  (337) 238-9393**
**COUNSEL FOR:**
    **Appellant - L.N.S. (mother)**

**Tony Clell Tillman**
**Public Defender's Office**
**501 South 4th Street**
**Leesville, LA 71446**
**Telephone:  (318) 239-7983**
**COUNSEL FOR:**
**Appellee - L.F.I. (father)**

**Lisa Kay Nelson**
**Williams & Nelson**
**P. O. Box 1810**
**Leesville, LA 71496-1810**
**Telephone:  (337) 238-4704**
**COUNSEL FOR:**
**Appellee - H.A.O., Jr. (father)**

**Ruby Norris Freeman**
**Louisiana Department of Children and Family Services**
**Bureau of General Counsel**
**900 Murray Street**
**Alexandria, LA 71301**
**Telephone:  (318) 487-5218**
**COUNSEL FOR:**
**Appellee - State of Louisiana, Department of Children and Family Services**

**Mary K. Beaird**
**Acadiana Legal Services**
**303 East Texas Street**
**Leesville, LA 71446**
**Telephone:  (337) 944-0299**
**COUNSEL FOR:**
**Appellees - M.D.S. (child), M.D.B. (child), and P.O. (child)**

**Max S. Antony**
**Antony Law Group, LLC**
**118 S. Third Street, Apt. A**
**Leesville, LA 71446**
**Telephone:  (337) 239-6557**
**COUNSEL FOR:**
**Appellee - State of Louisiana, DA**

**Tiffany Ratliff**
**Attorney a Law, LLC**
**303 East Texas Street**
**Leesville, LA 71446**
**Telephone:  (337) 397-4872**
**COUNSEL FOR:**
**Appellee - J.D.B. (father)**

**THIBODEAUX, Chief Judge.**

L.N.S., the mother of three minor children, M.S., M.B., and P.O., appeals the November 14, 2018 judgment of the trial court terminating her parental rights and certifying the three children for adoption.[1] The three minor children have three different fathers. The trial court's judgment reflected that L.F.I., the father of M.S., voluntarily terminated his parental rights. The judgment also terminated the parental rights of J.D.B., the father of M.B., and the parental rights of H.A.O. Jr., the father of P.O. The judgment of the trial court terminating the parental rights of the three fathers has not been appealed and is therefore a final judgment. For the following reasons, we reverse the termination of parental rights of the mother, L.N.S., and remand this matter to the trial court to allow her an opportunity to successfully complete a new case plan.

I.

## ISSUES

We must decide:

(1) whether the State proved by clear and convincing evidence the grounds for termination of parental rights under La.Ch.Code art. 1015(5) and (6); and

(2) whether the State proved by clear and convincing evidence that termination of L.N.S.'s paternal rights was in the best interest of the three minor children.

---

[1]The initials of the children and their parents are used to protect the identity of the minor child. *See* Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2.

## FACTS AND PROCEDURAL HISTORY

L.N.S. is the mother of three boys, now ages eleven, nine, and two. Respectively, they are M.S., M.B., and P.O. She and the children reside with H.A.O. Jr., the father of P.O., and P.R., the maternal grandmother of the children. The Department of Children and Family Services (DCFS) received a report on June 7, 2017, alleging the neglect of the mother for providing inadequate food and shelter in caring for the children.

The following day, a DCFS case worker arrived at the residence of L.N.S. and found that the water had been cut off for one day and then turned back on, and the electricity had been off for two days. The DCFS obtained a verbal instanter order for removal of the three children based upon "Dependency and Shelter Inadequate."

The DCFS then applied for an instanter order for removal of the three children, providing an affidavit that its intervention was required because of the lack of utilities. The DCFS also alleged that L.N.S. received $500.00 for food stamps, but used the money for drugs, as there was no food in the house. The DCFS also reported trash, dirty dishes, and laundry strewn about the home, as well as spoiled food in the refrigerator and sink; there was also a presence of odor, flies, and roaches. The maternal grandmother and the two older children confirmed that they had stayed with a neighbor the night before. L.N.S. and H.A.O., Jr. had left the residence with the baby, P.O., when the power was cut off.

L.N.S. confessed that she and H.A.O., Jr. had used methamphetamines the night before while in the presence of P.O. L.N.S. further admitted that they had left P.O. in the car with a friend, whose full name L.N.S. did

not know, while they were inside the home using drugs. Afterward, they went to spend the night at the home of another friend in New Llano. P.O. slept in his car seat. It was determined that the living situation was contrary to the health, safety, and welfare of the three children and that it was in their best interests to place them in the temporary custody of the State through the DCFS. The instanter order was granted on June 9, 2017, and a hearing on the continued custody of M.S., M.B., and P.O. was fixed for June 13, 2017, in order to determine whether there were sufficient grounds to find that the boys were children in need of services and that continued custody was necessary for their protection. The hearing was held as scheduled, and the trial court granted DCFS continued care, custody, and control of the minor children until the forty-five day adjudication hearing could be held or until further orders of the court.

The DCFS filed a petition to have the children designated children in need of care, and a hearing was set for August 2017. In the meantime, the Initial Family Team Meeting took place, and a case plan was created for L.N.S.,[2] who attended and participated. Under "Basic Obligations of Parents," she was required to provide safe and adequate housing, pay foster care costs of $25.00 per month per child if employed, or $10.00 per month per child if unemployed. L.N.S. was to obtain employment, comply with drug screens, submit to substance abuse and mental health assessments, and follow up with any recommended treatment and counseling. L.N.S. was further required to maintain positive support, attend visitation, and engage in parent education, anger management, and domestic violence classes.

---

[2] A Case plan was also created for L.F.I., father of M.S., and M.B., the father of M.B. Both fathers attended the Initial Family Team Meeting on June 26, 2017. H.A.O., Jr., the father of P.O., did not attend the Initial Family Team Meeting.

At the August 2017 hearing on the DCFS's petition, the children were adjudicated children in need of care. A case plan was approved, and a review hearing was ordered fixed for December 2017.

In November 2017, L.N.S. failed to attend the second family team meeting and review. At the case review hearing on December 13, 2017, the three children were continued in the custody of the DCFS upon a finding by the trial court that reasonable efforts had been made or offered by DCFS to reunify the family; that inadequate progress had been made toward "alleviating or mitigating" the causes of placement with the DCFS; and that return to their former home was contrary to the best interests of the children. The next review was set for June 2018, and custody was continued with the DCFS. The trial court also approved the case plan submitted by the DCFS which changed the goal plan from reunification to adoption and ordered all parties to comply.

The DCFS filed a petition for termination of parental rights and certification for adoption of the three children in September 2018. The hearing for termination of parental rights was held the following month, resulting in a judgment terminating the parental rights of the parents, which included the mother, L.N.S., and the three fathers, L.F.I., J.D.B., and H.A.O., Jr.

L.N.S. filed a timely suspensive appeal. She assigns two errors: (1) the trial court erred in terminating the parental rights of L.N.S., and (2) the trial court erred in finding that termination of parental rights was in the best interest of the children.

## III.

## STANDARD OF REVIEW

"An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard." *State ex rel. H.A.S.*, 10-1529, p. 11 (La. 11/30/10), 52 So.3d 852, 859 (quoting *State ex rel. K.G. and T.G.*, 02-2886, p. 4 (La. 3/18/03), 841 So.2d 759, 762).

## IV.

## LAW AND DISCUSSION

In cases involving the termination of parental rights, Louisiana courts are guided by a value for the sanctity of the family unit as set forth in the preamble of the Louisiana Children's Code:

> The people of Louisiana recognize the family as the most fundamental unit of human society; that preserving families is essential to a free society; that the relationship between parent and child is preeminent in establishing and maintaining the well-being of the child; that parents have the responsibility for providing the basic necessities of life as well as love and affection to their children; that parents have the paramount right to raise their children in accordance with their own values and traditions; that parents should make the decisions regarding where and with whom the child shall reside, the educational, moral, ethical, and religious training of the child, the medical, psychiatric, surgical, and preventive health care of the child, and the discipline of the child; that children owe to their parents respect, obedience, and affection; that the role of the state in the family is limited and should only be asserted when there is a serious threat to the family, the parents, or the child; and that extraordinary procedures established by law are meant to be used only when required by necessity, and then with due respect for the rights of the parents, the children, and the institution of the family, and only to the extent that such procedures are not prohibited by the Louisiana Constitution of 1974, as amended.

La.Ch.Code art. 101.

5

The basis for termination of parental rights in the DCFS petition was that L.N.S. had failed to adequately participate in services provided to her, or failed to substantially comply with the case plans previously approved by the trial court. The DCFS petition further alleged that L.N.S. had failed to provide significant contributions to the care and support of her three children while they were in the custody of DCFS, demonstrating an intent to permanently avoid parental responsibility. These allegations are derived from La.Ch.Code art. 1015(5)(b) and (6),[3] which provide the grounds for termination of parental rights applicable to this case:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

---

[3]Louisiana Children's Code Article 1015 was amended for technical corrections to the names of agencies or other references therein, effective August 1, 2018. As the judgment was signed on November 14, 2018, the 2018 amended version of Article 1015 applies.

Thus, in this case, we must examine four factors from the above paragraphs of La.Ch.Code art. 1015(5)(b) and (6): (1) lack of significant contributions to support the children; (2) passage of at least one year since the children were put in DCFS custody; (3) lack of parental compliance with the case plan; and (4) lack of reasonable expectations of significant improvement in the parent's condition or conduct in the near future.

## *Termination of Parental Rights*

In this case, the trial court found that L.N.S. failed to comply with her case plan to the extent that her parental rights should be terminated. But there is not clear and convincing evidence in the record that termination is appropriate as to L.N.S. As shown in our examination of the various components of L.N.S.'s case plan in the sections below, there was substantial compliance with the plan, and certainly not failures sufficient to demonstrate an intent to abandon her children and permanently avoid parental responsibility. Instead, the record reflects that L.N.S. was not given enough time or enough assistance to obtain the skills and housing necessary to have the three children returned to her custody. We note that DCFS called no experts for trial and, in fact, called only one witness, Ms. Megan Boudreaux, the DCFS case worker who handled L.N.S.'s case and the DCFS custody of the three children.

## *Parenting/Anger Management/Visitation/Contact With DCFS*

L.N.S. was required to complete an anger management course and parenting classes as part of her case plan. Ms. Boudreaux testified that L.N.S. began parenting and anger management classes on June 15, 2017, and completed the classes on October 24, 2017, satisfying these components of her case plan. Ms.

Boudreaux testified that L.N.S. was cooperative and maintained contact with DCFS, with the exception of a few months (conceivably between December 15, 2017 and January 31, 2018, when L.N.S. was in jail).

L.N.S. has maintained contact with her children and visited them during their custody with DCFS. More, specifically, Ms. Boudreaux testified that L.N.S. visited with her three children regularly and had attended thirty-three of the forty-four scheduled visits with P.O. and twenty of the twenty-five scheduled visits with M.S. and M.B. L.N.S. met weekly with P.O. and bi-weekly with the older children until May 2018, when the visits on all children were changed to monthly. Ms. Boudreaux testified that L.N.S. was bonded with her children and they were bonded with her, and there had never been a concern during the visits.

*Substance Abuse Evaluations/Treatment/ Drug Screens*

L.N.S. initially completed a substance abuse assessment on July 12, 2017, at Beauregard Behavioral Health. A treatment plan was created on August 23,2017, with sessions scheduled every three weeks for a period of three months. Ms. Boudreaux further testified that L.N.S. was sporadic in attendance and did not follow up, so they closed their case. Later, L.N.S. requested to be referred to another provider and was referred to Project Celebration on March 6, 2018. Again, she failed to follow-up, and they closed their case for non-compliance. At L.N.S.'s request, a third referral was made on May 24, 2018, to Caring Choices. Ms. Boudreaux testified that L.N.S. completed the assessment on September 20, 2018. At that time, no services were recommended as her drug screen was negative. Ms. Boudreaux testified that L.N.S. had several problems

with transportation throughout her case plan and that, at one point, L.N.S. had requested to be referred somewhere closer to where she was living, as she had moved since the initial referral was made. L.N.S. requested a referral to Caring Choices because she received mental health treatment from them.

Importantly, numerous drug screens were obtained from L.N.S., and the majority were negative for drug use. Negative screens were reported on September 20, 2018; May 29, 2018; February 26, 2018; September 19, 2017; August 9, 2017; and August 2, 2017, which were approximately two months after the children's removal. Additionally, L.N.S. had a negative hair follicle test on October 4, 2018, approximately one month prior to the trial to terminate. Two positive hair follicle tests were reported. Shortly after the children came into care in July 2017, L.N.S. tested positive for methamphetamine, which was consistent with her admission to the case worker during the first visit in June. The only other positive drug screen, according to Ms. Boudreaux, was on April 18, 2018, which was positive for methamphetamine. A drug screen in August 23, 2017, was positive for Lexapro and Trazadone, for which she had prescriptions, and for Gabapentin, which is not a federally controlled substance.

*Mental Health*

Mental health assessment and treatment as recommended was also a component of the case plan. While Ms. Boudreaux did not discuss this component in detail, she did testify that L.N.S. wanted a referral for a substance abuse assessment at Caring Choices. L.N.S. testified that the woman at Caring Choices wanted to help with the mental health and substance abuse together.

### *Income/Employment/Parental Contributions*

The financial components of the case plan were the main areas of concern for the case worker. The case plan required the parents to pay all or part of a child's care while in foster care. According to the payment schedule, as L.N.S. was unemployed, she was to contribute ten dollars per month for each of her three children. As of the date of the termination hearing in October 2018, L.N.S. had made one payment of $33.00 and was $480.00 in arrears in her contributions. L.N.S. admitted that she had failed to meet her parental support obligation because she did not have a job. However, as discussed below, poverty cannot supply the grounds for terminating parental rights.

Another component of the plan was to secure employment. Ms. Boudreaux testified that L.N.S. had informed her about several job interviews, but she did not obtain work. Ms. Boudreaux acknowledged that L.N.S. had prior convictions and agreed that this could have affected her ability to obtain employment. L.N.S. testified that she had applied at several places in the Leesville area. She received a job offer, but a background check revealed a felony conviction and disqualified her.

L.N.S. testified that she had a felony conviction for theft of over five hundred or fifteen hundred dollars and theft of utilities. She was convicted in 2013 and placed on probation for three years, which she completed in 2016. She also pled guilty to possession of synthetic cannabinoid in January 2018. L.N.S. further testified that the woman at Caring Choices was helping her complete the paperwork to apply for disability due to a shoulder injury that limited her ability to raise her arm.

However, the record does not reflect that meaningful assistance was provided by DCFS to help L.N.S. to overcome the obstacles she faced in preparing for the return of her children, as required by the Children's Code:

> Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts as defined in Article 603 to prevent or eliminate the need for removal of the child from his home and, after removal, to make it possible for the child to safely return home. The child's health and safety shall be the paramount concern. These determinations must be supported by findings of fact contained in the continued custody order issued pursuant to Article 627.

La.Ch.Code art. 626(B).

When asked what assistance was given to L.N.S. to find financial resources or low-income housing, Ms. Boudreaux indicated that L.N.S. had been given a letter for a charity where she could obtain used furniture, that she was already on food stamps, and that her felony rendered her ineligible for low-income housing. As discussed more fully below, this does not equate to reasonable efforts by DCFS under the Children's Code or the jurisprudence. Moreover, while the trial court stated that reasonable efforts had been made by DCFS, no factual findings were given to support this determination as required by La.Ch.Code art. 626(B).

*Housing*

A component of the case plan was safe housing. The basis for the initial report in this case centered around the housing situation of the children. At the time of removal of the children from the home, L.N.S. and the children were living with her mother, P.R., in a home where the electricity had been turned off. L.N.S. lived with H.O., the father of P.O., for a brief time at the

11

home of another person and then, shortly after the children were removed, she and her mother moved to a home in New Llano. In May of 2018, they moved again to a residence in Leesville, and L.N.S. was still residing at the residence at the time of the hearing; her mother was in a nursing home for a ninety-day period for rehabilitation and physical therapy for a broken leg but was expected to return to the home. Ms. Boudreaux testified that the condition of the current residence had been fine when she visited the home, although she expressed a few concerns. The electricity had been off for about two weeks, and reportedly the money to pay the utility bill had been stolen.

Ms. Boudreaux also mentioned that L.N.S. reported a flea problem in the middle of September but stated that she had gotten rid of the cats and had taken care of the problem. Ms. Boudreaux also mentioned an incidence of minimal food in the home. However, she said there were no negative physical conditions as far as the home was concerned, as the children had a room to share and there were beds for each child.

As seen above, there was substantial compliance by L.N.S. with her case plan, particularly with the things she could control by her own actions, such as completing the parenting and anger management courses, maintaining her visitation with her children and her contacts with DCFS. She also sought mental health treatment and passed almost all of her drug screens, at the end of which there was no recommendation for substance abuse treatment. She tried to find work, improved her living conditions, and had a home with beds for her children. Poverty was the largest hurdle that L.N.S. faced, and there was minimal assistance by the State in helping L.N.S. to achieve reunification with her children.

## H.A.S. Factors

We now return to the *H.A.S.* factors and the factors of La.Ch.Code art. 1015(5)(b) and (6), which supply the grounds for termination of parental rights in this case: (1) lack of significant contributions to support the children; (2) passage of at least one year since the children were put in DCFS custody; (3) lack of parental compliance with the case plan; and (4) lack of reasonable expectations of significant improvement in the parent's condition or conduct in the near future.

As to factor one, i.e., lack of significant contributions, a parent's poverty is not a ground for terminating her rights. In *Durand v. Durand,* 460 So.2d 97, 98 (La.App. 3 Cir.1984) (emphasis added), this court noted that "the degree of support is determined by the needs of the child, *as well as the circumstances of those who are obligated to pay it." See also St. Romain v. St. Romain,* 473 So.2d 390, 391 (La.App. 3 Cir. 1985). Moreover, reasonable efforts to assist a parent in removing the obstacles to reunification must be made, pursuant to La.Ch.Code art. 626(B), before a resort to termination of parental rights is appropriate. The Louisiana Supreme Court recognized this duty in *State ex rel. A.T.,* 06-501 (La. 7/6/06), 936 So.2d 79, and held that the Office of Community Services (now DCFS) had an obligation to make reasonable efforts to assist a parent in finding suitable housing before it could seek to terminate parental rights under La.Ch.Code art. 1015(5).

Likewise, in *State in Interest of P.A.R.,* 06-423, p. 4 (La.App. 3 Cir. 10/18/06), 942 So.2d 57, 60, where the grounds for termination were failure to comply substantially with the case plan and failure to provide support for six months, this court concluded that the "fundamentally fair procedure" required

by the supreme court and the Children's Code was not followed and, thus, the termination petition must fail. In so finding, this court quoted *State ex rel. G.J.L.*, 00-3278, p.5 (La. 6/29/01), 791 So.2d 80, 84, which states:

> In *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized that natural parents have a fundamental liberty interest in the care, custody, and management of their child and that the natural parents' interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." The Court went on to acknowledge that, while the State has an "urgent interest" in a child's welfare and in providing the child with a permanent home, as long as there is reason to believe that a positive, nurturing parent-child relationship exists, the State's interest must favor preservation over severance of natural familial bonds. *Id.* at 766, 102 S.Ct. at 1401 (quoting *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Thus, the Court found that parents who are faced with the possibility of forced dissolution of their parental rights must be provided with fundamentally fair procedures in order to ensure that children's legal bonds are not erroneously severed from fit parents. *Id.* at 753-54, 102 S.Ct. at 1395.

Here, there were no efforts by DCFS to assist L.N.S. in finding an employer who would accept a person with a criminal record; or to assist her in finding possible help from the community in addition to food stamps; or to assist L.N.S. in finding suitable housing that she and her mother could better afford. As the court stated in *A.T.*:

> Unlike the other grounds listed in La. Ch. C. art. 1015, termination under La. Ch. C. art. 1015(5) may only be ordered "after affirmative efforts have been attempted by the state to reunite the family by providing rehabilitative services, if needed, to the parent." Lucy S. McGough and Kerry Triche, *Louisiana Children's Code Handbook*, p. 522 (2006).

Here, the trial court's order terminating parental rights under La. Ch. C. art. 1015(5) was erroneous because the record reflects that OCS never undertook reasonable efforts at reunification after the children were taken into state custody. OCS admits that no rehabilitative services were offered to Ms. A to assist her in obtaining suitable housing after the children were taken into custody in October of 2002, yet this was the main, if not sole, impediment to reunification cited continuously by OCS.

Further, based on this record it is impossible to discern whether Ms. A was unable to provide adequate housing because of lack of adequate assistance or was simply unwilling to provide adequate housing. This is significant because clearly if she was simply unwilling, grounds for termination would exist. However, the State bears the burden of proof by clear and convincing evidence and where the record does not reflect that in spite of reasonable efforts by the State to provide assistance, the parent still would not obtain adequate housing, this burden cannot be met. On the other hand, *under our law, a child cannot even be found to be a child in need of care under La. C.C. art. 606 where the sole ground for taking the child into state custody is that the "parent is unable to provide basic support, supervision, treatment, or services due to inadequate financial resources."* La. C. Ch. art. 606(B); see also La. C. Ch. art. 603(14)(a) ("Consistent with Article 606(B), the inability of a parent or caretaker to provide for a child due to inadequate financial resources shall not, for that reason alone, be considered neglect"). In fact, this Court has held that termination of parental rights would be unjustified if lack of stable housing is the only ground for such termination. *State ex rel. S.M.W.*, supra at 1236. In this case, the record does not contain clear and convincing evidence that termination is warranted under La. Ch. C. art. 1015(5).

*A.T.*, 936 So.2d at 85-86 (emphasis added) (footnotes omitted).

Similarly, here, we find that the State has not proved by clear and convincing evidence that termination of parental rights was proper under factor one of the analysis.

Under factor two, i.e., the passage of one year since the children were taken into custody, Ms. Boudreaux testified that the case plan was changed from reunification to adoption in May 2018. The children were taken into custody in June 2017, just eleven months before. While the court did not accept the plan until June 1, 2018, and it has discretion to shorten the one-year requirement of La.Ch.Code art. 1015(6), we nevertheless find that the DCFS and the trial court were in a rush to judgment under the facts of this case, where there is no clear and convincing evidence that termination of parental rights was appropriate.

Under factor three, i.e., lack of compliance with the case plan may be evidenced by various items enumerated in La.Ch.Code art. 1036(C),[4] which are substantively the same elements already discussed in detail in our analysis of the case plan. As described above, while not perfectly compliant, L.N.S. substantially complied with her case plan. She timely completed parenting and anger

---

[4]C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Ch.Code art. 1036(C). Article 1036 was amended effective in May 2018, which amendment applies to the present judgment of November 2018.

management courses; she tested negative on almost all of the drug screens, including the most recent ones; she obtained housing with her mother, and the home was found to be clean, with working utilities and adequate room and beds for the children; she attended regular visitations with her children, with hugs and proper bonding witnessed by the case worker, who also noted that L.N.S. properly held and fed the baby, and testified that there were no concerns during visitations. L.N.S. is also in mental health treatment, and, although she was evaluated for substance abuse and earlier found to be in need of some level of treatment according to the caseworker, most recently L.N.S. tested negative, and the latest provider recommended no treatment for substance abuse.

Under this factor, financial contributions have been the main hurdle for L.N.S., and, as discussed above, we believe that the statutorily-mandated assistance by DCFS, if given, would have helped this mother to resolve the employment and income issues that prevented her from reuniting with her children. Accordingly, the State failed to prove, by clear and convincing evidence, a lack of compliance with the case plan sufficient to terminate parental rights.

Under the fourth and last factor, i.e., there must be a lack of reasonable expectation of significant improvement in the parent's condition or conduct in the near future. Pursuant to the relevant portions of La.Ch.Code art. 1036(D) (emphasis added):

> Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that

17

renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, *based upon expert opinion or based upon an established pattern of behavior*.

. . . .

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, *based upon expert opinion or based upon an established pattern of behavior*.

Here, the trial court essentially focused its reasons to terminate on drug usage by the mother and the fact that she had no income or money. No one focused on whether there was a lack of a reasonable expectation of significant improvement in the mother's conduct. Article 1036(D) of the Children's Code states that this factor must be proved "based upon expert testimony or based upon an established pattern of behavior." There was no expert testimony in this case. The only person to testify was the case worker. Nor was there an established pattern of behavior such as would denote a "lack of any reasonable expectation of significant improvement in the parent's conduct in the near future." No expert testified that the mother's previous substance abuse issue placed the children in a substantial risk of harm, and there was no evidence of prior neglect at the termination hearing as required by Article 1036(D)(1) of the Children's Code.

L.N.S. had only two positive drug screens during the time of the State's intervention. She had a negative drug screen one month prior to the hearing, and a negative drug screen as early as two months after the children were placed in State custody. It is true that the first two referrals by the State for substance abuse treatment were not completed. However, the mother chose a third alternative which also provided mental health counseling. She was not given drug treatment

because her drug screen came back negative. L.N.S. completed anger management and parenting classes four months after the children were placed in State custody. She attended 75% of her visits with the youngest child and 80% of her visits with the two older children.

The case worker testified that L.N.S. cooperated in her contacts with DCFS with the exception of the few months when she was incarcerated. She did reside at three different places. However, the case worker said the condition of the mother's current home was fine; there were no physical impediments. There were a few concerns with the electricity being cut off for two weeks and flea infestation. However, the testimony was that the flea infestation had been taken care of and the electricity had been turned back on.

Even the case worker conceded that the mother had made improvements. Essentially, this case is based upon drug usage, with which L.N.S. had made substantial improvement, and with the issue of poverty in that the mother had not been able to make the necessary payments. That is not enough to show that there was no reasonable expectation of improvement in the mother's conduct.

Moreover, the State provided minimal efforts to assist the parent in removing the obstacles. Article 626(b) of the Children's Code clearly provides that such efforts must be made. And, the jurisprudence holds that the State must make affirmative efforts to assist the parent. The State did virtually nothing in this case. The State has not shown a lack of reasonable expectation of significant improvement. To the contrary, the record indicates that the mother had many strengths and had made efforts to find work and housing and to address all elements of her case plan. We find that the State has not proved by clear and

convincing evidence that the parental rights of L.N.S. should be terminated under the *H.A.S.* factors and La.Ch.Code arts. 1015 and 1036.

## *Best Interest of the Children*

A trial court may terminate parental rights only if it finds that termination is in the best interest of the child. *See* La.Ch.Code art. 1037(B); *State in the Interest of D.H.L.*, 08-39 (La.App. 3 Cir. 4/30/08), 981 So.2d 906. "This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to that of the parent." *State in the Interest of G.E.K.*, 14-681, p. 3 (La.App. 3 Cir. 1/14/15), 155 So.3d 713, 716. While the best interest of the child is a consideration in a termination proceeding, it cannot serve as the ground for involuntary termination; the best interest of the child is a consideration *only after the grounds for termination have been proved* under one of the enumerated grounds of La.Ch.Code art. 1015, as discussed above. *See State ex rel. D.R.B.*, 00-1321 (La.App. 3 Cir. 12/6/00), 777 So.2d 508. The evidence must allow the conclusion that termination is in the best interest of the child. *State in Interest of J.M.*, 30,302 (La.App. 2 Cir. 10/29/97), 702 So.2d 45, *writ denied*, 97-2924 (La. 2/6/98), 709 So.2d 736.

In the present case, as shown above, the State did not prove by clear and convincing evidence the four factors of La.Ch.Code art. 1015(5)(b) and (6), and the evidence in this case does not lead to the conclusion that the parental rights of L.N.S. should be terminated. DCFS placed M.S., M.B., and P.O. in foster care in June 2017. As of the November 2017 case plan review, the children were in their third placement. At the time of the hearing, M.S. and M.B. were placed

with the paternal grandmother of M.S. and have been in that home since August 2017. However, the parental rights of M.S.'s father were terminated at the same hearing, where the father stipulated to the termination, and M.S.'s father has not appealed. None of the three fathers appealed the termination of their parental rights. Ms. Boudreaux testified that the two older boys had thrived in the home of the paternal grandmother of M.S. and that she was in the process of obtaining a certification to adopt. However, only M.S. is related to the paternal grandmother, and little was mentioned at the hearing regarding the placement of P.O., who has been in foster care since taken into custody by DCFS as a one-month-old infant.

M.S., M.B., and P.O.'s long-term, continuous family relationship in a secure and stable environment is the ultimate goal. *See State in the Interest of R.J.*, 18-332 (La.App. 3 Cir. 9/26/18), 255 So.3d 1138. The State presented no evidence to suggest that M.S., M.B., and P.O. would not be secure and stable in their mother's home, with all siblings united. The State bore the burden of proof by clear and convincing evidence and failed to meet this burden. Based upon the record before us, we find that the trial court was manifestly erroneous in finding that the termination of L.N.S.'s parental rights and the release of M.S., M.B., and P.O. for adoption were in the best interest of the children. L.N.S. was not proved unfit by clear and convincing evidence. Conversely, the evidence shows that she has been working toward permanent reunification with her children and had made significant improvement toward that goal. In *H.A.S.*, where the court found that termination of the mother's parental rights was improper and not in the best interest of the children, the court discussed the options available:

21

> When the alleged grounds under La. Ch.C. art. 1039 are not proven by clear and convincing evidence, or the court finds that termination is not in the best interest of the child, the court may: (1) dismiss the petition; (2) reinstate the parent to full care and custody of the child; (3) if the child has been previously adjudicated as a child in need of care, reinstate that proceeding pursuant to Title VI; (4) upon a showing of sufficient facts, adjudicate the child in need of care in accordance with Title VI; (5) upon a showing of sufficient facts, adjudicate the family in need of services in accordance with Title VII; or (6) make any other disposition that is in the best interest of the child. *State ex rel. K.G. and TG., supra* [02-2886 (La. 3/18/03), 841 So.2d 759] at 768.

*H.A.S.*, 52 So.3d at 862.

Accordingly, this case is remanded for the purpose of giving this parent another opportunity to successfully complete a new case plan consistent with this opinion. Toward that end, we direct the DCFS to make reasonable efforts to assist L.N.S. in removing the obstacles to reunification with her children. Specifically, those efforts will focus on L.N.S.'s financial issues and services available to help her find employment or to become employable, and to obtain services or resources, including housing, food, and transportation. The plan should be in place for a period of not less than nine months to provide L.N.S. sufficient time to work toward completion of the plan. If random drug screens are deemed appropriate, L.N.S. should be provided written results of the tests and should be given an opportunity to present valid prescriptions to the trial court for any positive result. Only after the stated period has passed, and only if DCFS has made reasonable efforts to assist L.N.S., should a new termination proceeding be instigated, if necessary, to determine whether L.N.S. has substantially complied with the new plan.

## V.

## CONCLUSION

For the foregoing reasons, we reverse the portion of the trial court's November 15, 2018 judgment that terminates the parental rights of the mother, L.N.S., and we reverse the portion that certifies the children as eligible for adoption. We remand the case to the trial court to give L.N.S. the opportunity to comply with a new case plan consistent with this opinion.

**REVERSED AND REMANDED.**

**STATE IN THE INTEREST OF M.S., M.B., and P.O.**


Conery, J., dissents and assigns reasons.

I respectfully dissent on the basis that my learned colleagues have misapplied the manifest error standard of review.

The majority has chosen to reverse the distinguished trial judge's decision terminating the parental rights of the mother, L.N.S, and remanding the case to the Department of Children and Family Services (DCFS) for further proceedings. This despite a record, when reviewed in its entirety for manifest error, supports the trial court's determination that L.N.S. failed to provide the appropriate housing, the court ordered support to the three children, and failed to "substantially" comply with her case plan to obtain drug treatment. The trial court further found that releasing the three male children for adoption was in their manifest best interest.

The Louisiana Supreme Court in the recent case of *State in Interest of A.L.D.*, 18-1271 (La. 1/30/19), 263 So.3d 860, reversed the appellate court and reinstated the trial court's judgment terminating the parental rights of the children's father, C.K.D. The supreme court again reiterated that the manifest error standard of review was to be applied by the appellate court in its review of termination of parental rights cases. The supreme court found in *A.L.D.* that, "The district court was actively engaged at trial and heard all the witnesses and was given an opportunity to weigh their testimony, and the court of appeal erred by reinterpreting the evidence and engaging in a *de novo* review." *Id.* at 867. Respectfully, that is the case here. The

able trial judge heard the evidence directly and was in the best position to and did carefully weigh the evidence and assess the credibility of the witnesses. The majority has, in effect, "reinterpreted the evidence" and engaged "in a de novo review." Its reversal and detailed remand order should be vacated and the trial judge's decision affirmed.

The majority contends that L.N.S. was not given enough time to address the issues which led to the removal of her three children, and that DCFS had not done enough to "help" her reach "substantial compliance" with her case plan. However, the evidence presented at the trial amply demonstrated that L.N.S. had a long standing pattern of bad behavior and had failed to address the overriding problem of drug abuse and lack of proper housing which is and was the source of her inability to remedy her situation, and which ultimately led to the removal of the children and their present placement under the auspices of the DCFS. While the majority accurately points out that DCFS did not present an "expert opinion" as permitted by La.Ch.Code art. 1036(D), the record abundantly supports a finding of an "established pattern of behavior" and, in turn, a finding of a lack of a reasonable expectation of significant improvement in L.N.S.'s future conduct. The trial court detailed such a pattern in its reasons for ruling. *See State in Interest of A.L.D.*, 263 So.3d 860.

The record reflects that DCFS was aware of L.N.S and her children before their initial removal. The agency had already put a preventative safety plan in place, which fell through for non-compliance and resulted in the removal of the three children from L.N.S.'s custody on June 8, 2017. The affidavit in support of the June 9, 2017 Instanter Order provided that the home was without electricity, which had been turned off since June 5, 2017. The water had apparently been turned off for a

day but was turned back on. L.N.S. was receiving $500.00 in food stamps, but had apparently used the money for drugs as there was no food in the house.

Ms. Megan Boudreaux, the DCFS worker who handled the case from its inception, testified at the hearing on behalf of DCFS. Her testimony was supported by the photographs of the residence, submitted into evidence at the hearing, that there was trash on the floors throughout the residence. Further, dirty dishes were in the sink and all about the home, along with spoiled food in the refrigerator and in the sink. Laundry was strewn throughout the home and there was a strong, foul order. Ms. Boudreaux also found the presence of flies and an infestation of roaches.

When the DCFS worker arrived at the home on June 8, 2017, L.N.S.'s mother, P.R., and the two older children, M.S. and M.B., said they had not seen L.N.S. for two days and had no way to reach her. L.N.S. arrived at the residence later with her eighteen (18) day old infant son, P.O., and P.O.'s father. She confessed that she and P.O.'s father had done a line of methamphetamines the night before while P.O. was supposedly in "their care." L.N.S. further admitted that they had left P.O. in the car with a friend, who L.N.S. could not identify, while they were inside a home using drugs. After the drug use, the couple drove to the home of another friend and the eighteen day old infant, P.O., slept in a car seat. DCFS provided strong support for removal, as the health and safety of all three children were at severe risk.

*Louisiana Children's Code Articles*

Louisiana Children's Code Article 1015(5)(b) and 1015(6)[1] provide the grounds for termination of parental rights applicable to this case and states:

---

[1] Louisiana Children's Code Article 1015 was amended effective August 1, 2018. Judgment was signed on November 14, 2018. Therefore, the new version of La.Ch.Code art. 1015 applies, but the pertinent provisions of the article remained the same.

3

(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

### *Parental Contributions - Louisiana Children's Code Article 1015(5)(b)*

L.N.S.'s original case plan dated July 17, 2017, as well as the two subsequent case plans, required L.N.S., to contribute only ten dollars ($10.00) a month per child for their "care and support." This low amount was set due to her unemployment. At the time of the termination hearing on October 29, 2018, almost sixteen months later, the trial court made the undisputed finding that L.N.S. had made only "one payment of $33[.00] and there is owing $480[.00] as of today." The trial court further found that L.N.S. had failed to provide any support for the three children for a period of over six months.

A panel of this court in *State in Interest of J.A.*, 17-500, p. 4 (La.App. 3 Cir. 1/4/18/), 237 So.3d 69, 72, provided "the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035." However, the court further stated:

The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be

4

established." *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881, 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id.*; La.Ch.Code art. 1037.

*Id.*

The majority found in its re-interpretation of the evidence that L.N.S.'s situation is the result of the DCFS failing to give enough assistance or time to "help" L.N.S. during the period when the children were in the custody of the agency, to help her obtain the skills necessary to produce an income, and to help her provide the stable housing necessary to have the three children returned to her custody. However, the record in this case supports the trial court's findings that given the conduct of L.N.S. over the sixteen months that the three children were in the care of DCFS, L.N.S. had made little if any progress in helping herself. In several ways, L.N.S. has hurt her chances to ever be able to support herself or her children and provide a safe environment over the long term necessary to raise her children.

### No Substantial Compliance with the Case Plan - Louisiana Children's Code Article 1015(6)

The testimony and the trial record support the conclusion that L.N.S. remains relatively in the same position as when the children were removed from her in June 2017. She is dependent on her disabled mother for both her support and housing, receiving only her share of the food stamp allocation. Further, despite a sporadic positive drug testing history and documented drug use, she violated the conditions of her case plan and was convicted of drug use while the children were in DCFS custody. In fact, she has never received the court ordered drug treatment required by her case plan despite being referred to two treatment programs, both of which were terminated for noncompliance, just as she was non-compliant with the

preventative safety plan DCFS had put in place prior to P.O.'s birth. It is axiomatic that the DCFS cannot help those who will not help themselves.

The trial court properly found, based on all the evidence in the record, that L.N.S.'s failure to address her drug problem and obtain stable housing was the basic source of all of the impediments that prevented her from obtaining the job skills which could lead to a reliable income, which in turn was necessary for her to acquire adequate housing suitable for the raising of her three children, now ages two, nine and eleven years old. The trial court summarized L.N.S.'s non-compliance with the case plan with respect to evaluation and treatment for drugs as follows in its oral reasons:

> She did complete the initial assessment[,] but her case was closed for noncompliance. She then requested another agency to do that. She was given that option and that case was also closed for noncompliance. She then requested to be referred to Caring Choices where there was a negative drug screen and they didn't recommend any treatment. However, [L.N.S.] did admit to using meth when the children were removed and she also had a positive drug screen for methamphetamine on July the 5th, 2017 and, also, a positive test for methamphetamine on April the 18th of 2018. She admitted to having a conviction for possession of synthetic cannabinoids sometime around January of [2018.]

The record shows that L.N.S. waited until shortly before trial before finally going to Caring Choices. The trial court, as well as the DCFS social worker, Ms. Boudreaux, expressed their concern over the history of L.N.S.'s drug use and the sporadic nature of her drug screens. As indicated at the time of removal, L.N.S. had been away from the two older children for two days while she admittedly used drugs. She had in her immediate care her eighteen (18) day old infant when she admitted to using methamphetamines on the evening of June 7, 2017, the date prior to the three children being removed from her care, leaving the infant in the care of someone she did not know and then allowing the infant to sleep in his car seat.

6

Both the DCFS and the trial court expressed concern about L.N.S.'s failure to comply with the first two drug treatment programs it had required her to attend and which resulted in her termination for non-compliance. After again testing positive for methamphetamines in April 2018, it was not until four months later, on September 20, 2018, approximately five weeks before the parental rights termination hearing on October 28, 2018, that she went for her initial evaluation and received a negative hair follicle drug test at Caring Choices. Despite her long history of drug abuse and sporadic positive drug testing, and her conviction for drugs in December 2017 and incarceration through January 2018, Caring Choices for some un-explained reason chose not to provide L.N.S. drug treatment services.

When Ms. Boudreaux was asked by counsel for L.N.S. during the hearing if the DCFS was "satisfied that she's [L.N.S.] not using drugs anymore?" Ms. Boudreaux responded:

> A. Um, I mean, according to her drug screens, they have been negative with the exception since April. Um, the concern with the Agency is that she's been referred three times for substance abuse treatment. She did not comply with the first two, and then she did not comply the third time until four months later.
>
> Q. Okay.
>
> A. Yeah.
>
> Q. And, so did she actually comply with the treatment or did –
>
> A. Well –
>
> Q. – she just [got] a negative screen when she went for her assessment?
>
> A. They – right, she had a negative drug screen for assessment[,] and they recommend no services.
>
> Q. Okay. So, it is safe to say that she might not be equipped with the tools to continue on sobriety because she never did the treatment?

A.    Correct.

*Lack of Stable Housing and Long History of Criminal Behavior*

The record further reflects that L.N.S. had a long history of criminal convictions dating back to 2004, including several felony charges and at least one felony conviction which would bar her from obtaining any form of subsidized housing of her own without the aid of her disabled mother.  Her arrest record, referenced by Ms. Boudreaux in her testimony, included, possession of marijuana; disturbing the peace intoxication; battery of a correctional officer; simple burglary; unauthorized entry of an inhabited dwelling; criminal trespass; theft; criminal conspiracy; and theft of utilities.  Further, L.N.S. was incarcerated during the time DCFS had custody of the three children from December 16, to January 31, 2018 on her arrest and conviction of possession of synthetic cannabinoids and drug paraphernalia.

L.N.S.'s mother has obtained a new apartment, and L.N.S. moved in with her in May 2018, after having three other prior residences.  However, the record reflects that the DCFS worker had concerns about L.N.S.'s new residence with her disabled mother.  Once again, the electricity had been turned off for approximately two weeks on or about August 21, 2018, typically one of the hottest parts of the summer.  L.N.S. claimed that she was unable to pay the electricity bill because "her money had been stolen."  Also, in mid-September, just before trial, there was an infestation of fleas, which was allegedly remedied by the removal of a cat from the home.  There was minimal food in the home, and if the children were to be returned to her care, there was inadequate shelter, as all three children would have had to share a bedroom.

The record further reflects that the DCFS worker testified that this apartment would not satisfy their requirement for stable housing, "as there was a financial issue

8

again with the housing prior to this one with not being able to pay the rent which caused them to have to move due to eviction." Not to mention no electricity for two weeks during August! Therefore, appropriate, stable housing remained a great concern, as once again L.N.S. was living with and was totally dependent on her disabled mother and continued her pattern of not paying water and electric bills.

The trial court correctly found that L.N.S.'s situation at the time of termination essentially remained the same as some sixteen months earlier, when the children were removed from her care and placed in DCFS custody. There had been little to no improvement, thus DCFS concluded that further improvement was highly unlikely and sought termination. The lack of adequate housing is a special concern because if L.N.S.'s disabled mother, who is her sole support, suffers a decline in her health and is forced to move to a different facility, L.N.S. would have no housing at all, no job prospects, no financial resources and a history of continued drug use and criminal activity over a period of many years.

### *Best Interest of the Children*

The majority opines that the record and the trial court's reasons did not support a determination that L.N.S. failed to "substantially" comply with La.Ch.Code art. 1015(6), and therefore, without expert testimony, the trial judge was unable to reach a determination whether terminating her parental rights is in the best interests of the three children.

However, it is undisputed that the trial court found that L.N.S. failed to comply with La.Ch.Code art. 1015(5)(b), failing to provide "significant contributions to the child's care and support for any period of six months," by paying only $33.00 over the almost sixteen month period prior to the termination hearing. She also exhibited a pattern of behavior that demonstrated she was non-compliant

9

with her case plan to obtain meaningful drug treatment and appropriate stable housing. As previously stated, "Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id.*; La.Ch.Code art. 1037." *State in Interest of J.A.*, 237 So.2d at 72.

Further, *State in the Interest of R.J.*, 18-332, p. 15 (La.App. 3 Cir. 9/26/18), 255 So.3d 1138, 1147, provides:

> Our juvenile justice system places paramount importance on the best interests of the children involved and is designed to protect their rights to "thrive and survive." *State in the Interest of S.M.*, 98-922, p. 14 (La. 10/20/98), 719 So.2d 445, 452. Thus, although parental rights are protected by the enforcement of procedural rules enacted to insure that they "are not thoughtlessly severed" in a termination hearing, **those rights "must ultimately yield to the paramount best interest of the children" if the failure to terminate the parental rights would "prevent adoption and inhibit the [children's] establishment of secure, stable, long term, continuous family relationships."** *Id*.

(Emphasis added.)

In this case, the able trial judge took into consideration the circumstances surrounding the placement of the three children by the DCFS and their chances for adoption. The two oldest boys are in the home of J.B., the paternal grandmother of M.S., who lives in Leesville, Louisiana. Although M.B., the younger of the two boys, is a half-brother to M.S. and not related to J.B., J.B. and her husband have applied to adopt the two brothers so that they can remain together. The boys are a little less than two years apart and are very close.

Since their arrival at J.B.'s home on August 18, 2017, M.S. and M.B. seem to have thrived both "behaviorally and academically." Both boys have expressed their wish to remain in J.B.'s home, as they are now well settled and reaching the age where a firm hand is needed to guide them both though adolescence. Ms. Boudreaux testified that it is the expectation of the DCFS that J.B. will adopt the two children

and was in the process of certification of the time of trial. Ms. Boudreaux testified she spoke monthly with J.B. and does not anticipate any impediment to the adoption if M.S. and M.B. are certified as free for adoption by the trial court.

The youngest child, P.O., is currently placed in the certified foster adoptive home of R.M. and B.M. in Pineville, Louisiana. P.O. was born on May 22, 2017 and was taken into the custody of the DCFS when he was approximately eighteen days old. He has not resided with his mother since removal. He appears to be doing well and was referred to and tested by Early Steps, which found no developmental delays. It is also the DCFS's plan that P.O. be adopted by his current foster adoptive parents, R.M. and B.M., if he is freed for adoption.

At the time of the hearing in October 2018, it had been almost sixteen months since the children were removed from L.N.S.'s care. In expressing its reasons for termination of parental rights of L.N.S., the trial court stated:

> As I was considering this evidence, I kept hearing or remembering Mr. Simms [(counsel for L.N.S.)] asking the case worker about whether there's been some improvements and whether there's been some improvements. And, of course, what Ms. Boudreaux – Ms. Boudreaux kept saying is it's – it's been – it's been over a year. And that's what I keep remembering. She may have made some improvements[,] but I don't think they're significant and it's – it's been over a year. Simply chose to wait and wait and wait before ever attempting to do anything and the court agrees with that.

Under the manifest error standard of review, the trial court's decision is fully supported by the record.

Finally, the majority on remand would require that the DCFS adopt a case plan "for a period of not less than nine months to provide L.N.S. sufficient time to work toward completion of the plan. . . . Only after the stated period has passed, and only if DCFS has made reasonable efforts to assist L.N.S., should a new

termination proceeding be instigated, if necessary, to determine whether L.N.S. has substantially complied with the new plan."

I would find that this remand order is especially problematic. Our Court has no way of knowing what has happened to L.N.S. since the termination hearing in October 2018, some eight months ago. This effort to micromanage the agency and the trial judge, especially in a child protection case, is ill advised at best. While the majority may lawfully, if it chooses, recommend a course of action, the fluid nature of child protection proceedings would dictate that the agency, and especially the trial judge, must be given the ability to issue such orders as may be appropriate for the protection and welfare of the children. *See Carter v. Iberia Par. Sch. Bd.*, 17-594 (La.App. 3 Cir. 12/13/17), 258 So.3d 740. *See also Rhymes v. Rhymes*, 13-0823 (La. 10/15/13), 125 So.3d 377 (Knoll, J., concurring). I further dissent from the specific requirements of the remand order.

Accordingly, I would affirm the judgment of the trial court dated November 14, 2018 terminating the parental rights of L.N.S. and certifying the three minor children M.S., M.B, and P.O. for adoption.